Argued and submitted on January 28, reversed and remanded March 31, 2010

# STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

# ROBERT HOWARD LOVERN,
*Defendant-Appellant.*

Benton County Circuit Court
CM0720620; A137247

228 P3d 688

Anne Fujita Munsey, Senior Deputy Public Defender, argued the cause for appellant. With her on the briefs was Peter Gartlan, Chief Defender, Appellate Division, Office of Public Defense Services.

Anna M. Joyce, Assistant Attorney General, argued the cause for respondent. With her on the brief were John R. Kroger, Attorney General, and Jerome Lidz, Solicitor General.

Before Haselton, Presiding Judge, and Armstrong, Judge, and Rosenblum, Judge.

HASELTON, P. J.

## HASELTON, P. J.

Defendant appeals from a judgment of conviction for 16 counts of sexual abuse in the first degree. ORS 163.427. In his first two assignments of error, he argues that the trial court erred in admitting a medical doctor's testimony regarding the "process of disclosure" and recantation by sexual abuse victims. His third assignment of error challenges the trial court's admission of the doctor's medical diagnosis that the complainant had been sexually abused. As explained below, we agree with defendant that the latter ruling was, in all events, "an error of law apparent on the face of the record," ORAP 5.45(1),[1] given the Supreme Court's recent decision in *State v. Southard*, 347 Or 127, 218 P3d 104 (2009). *See State v. Jury*, 185 Or App 132, 57 P3d 970 (2002), *rev den*, 335 Or 504 (2003). We further conclude that it is appropriate for us to exercise our discretion to correct that error in this case. *Ailes v. Portland Meadows, Inc.*, 312 Or 376, 381-82, 823 P2d 956 (1991). Accordingly, we reverse and remand on the basis of defendant's third assignment of error. Because the record may develop differently on retrial, we do not address defendant's other assignments.

The facts relevant to the issue before us on appeal are not in dispute. The complainant in this case is defendant's daughter. In May 2007, when the complainant was 12 years old, she disclosed to two of her friends at school that defendant was molesting her. At their urging, she spoke with the school counselor who, in turn, contacted the police. The complainant was then interviewed by Detective Stauder; that interview was recorded, and the school counselor and a caseworker from the Department of Human Services (DHS) were also present. The complainant told Stauder that defendant had touched her vagina, breasts, and buttocks, and that he had penetrated her bottom with his penis.

Defendant was arrested at the family home later that day. The police then brought the complainant home to

---

[1] ORAP 5.45(1) provides, in part:

"No matter claimed as error will be considered on appeal unless the claim of error was preserved in the lower court * * *, provided that the appellate court may consider an error of law apparent on the face of the record."

her mother. According to the complainant's mother, immediately after the police left, the complainant said, " 'Why are you crying, Mommy? He's out of the house. Now he has to go get a job.' " When the mother explained to the complainant that " '[t]hat's not how this works,' " and told the complainant to tell her the truth, the complainant said that she had lied to the police. A few days later, the complainant also told Stauder that she had lied earlier and that she could not remember what she had said. In response to Stauder's specific questions, she said that it was true that defendant had touched her breasts and vagina, but that her statements about defendant penetrating her bottom were not true.

The complainant was subsequently evaluated at ABC House, a child victim assessment center. Dr. Chervenak, a physician and medical director of the ABC House who has specialized training and experience in the area of child abuse, conducted the examination. Before meeting with the complainant, Chervenak reviewed DHS's referral and a transcript of the complainant's interview with Stauder. She then obtained a medical history from the complainant's mother and from the complainant. Finally, she conducted a "head-to-toe" physical examination of the complainant. In describing the results of her physical examination of the complainant's vaginal area and hymen, she testified that the complainant

> "has what I would call a non-specifically abnormal exam, so basically in that gray zone that I can't really tell one way or the other. It wasn't perfectly normal but it wasn't specifically abnormal that I know for sure there's been an injury there. She had a couple of notches in part of her hymen. There—it's an unusual appearance to have that level of notching but it's not so specific that it indicates that there was clearly an injury there before."

During the examination, the complainant denied that anyone had hurt her or touched her intimate parts. Instead she told Chervenak, " 'I got mad at my dad and told a lie and it got out of control.' "

Defendant was charged with two counts of sodomy in the first degree; one count of attempted sodomy in the first degree; one count of incest; and 16 counts of first-degree sexual abuse, based on touching the complainant's breasts and

vaginal area. At trial, the complainant testified that she had not been sexually abused by defendant and that she had lied to her friends, the school counselor, and the police. She said that she had gotten into a fight with her father the night before and that she was angry with him for not working and not "pulling his weight around the house." Defendant testified and denied that any abuse occurred.

The jury listened to portions of the recording of Stauder's first interview with the complainant, in which the complainant had made the allegations against defendant. In addition, the state sought to elicit testimony from Chervenak to counter the primary defense theory that the complainant had lied initially in disclosing the abuse. Over defense counsel's objection, Chervenak testified about the disclosure process for child victims of sexual abuse; she further testified that "between six percent and 22 percent of children at this age will recant, and that is also—for some patients is part of the process." When the prosecutor asked Chervenak if she had been "able to form an opinion to a medical certainty of more likely than not of whether or not [the complainant] had been sexually abused," defense counsel again objected, arguing "no foundation." The court overruled the objections, and Chervenak testified that her diagnosis was "[t]hat there has been sexual abuse in this patient." Chervenak stated that her diagnosis was based on the complainant's "initial detailed statements, which were spontaneous, the subsequent non-detailed recantation, her anal/genital exam, and her affect during the exam with me."[2]

The jury found defendant guilty of the 16 counts of first-degree sexual abuse. Defendant was acquitted on the remaining counts—that is, the sodomy, attempted sodomy, and incest charges.

---

[2] Chervenak's testimony in that regard, including her unadorned reference to the results of the physical examination, paralleled the general protocol for conducting child abuse examinations, which she had previously described. As noted below, see 234 Or App at 511 n 6, there is no relationship between the "unusual appearance" of the complainant's hymen and the type of sexual abuse charged in this case; accordingly, Chervenak's general reference to the complainant's anal/genital examination cannot be understood to indicate reliance on that abnormality as corroborating the abuse alleged here.

■　　On appeal, defendant raises three assignments of error, challenging the admissibility of various aspects of Chervenak's testimony. Because it is dispositive, we address only defendant's third assignment, in which defendant asserts that the trial court erred in admitting Chervenak's medical diagnosis of sexual abuse.[3] We review whether scientific evidence is admissible for errors of law. *Jennings v. Baxter Healthcare Corp.*, 331 Or 285, 299-301, 14 P3d 596 (2000); *State v. Helgeson*, 220 Or App 285, 185 P3d 545 (2008).

In challenging the admissibility of Chervenak's diagnosis, defendant argues, *inter alia*, that the diagnosis should have been excluded because, as the Supreme Court explained in *Southard*, its prejudicial effect is substantially outweighed by its limited probative value. 347 Or at 141.[4] The parties dispute whether defendant's present contention in that regard was adequately raised and preserved below.[5] We need not resolve that dispute, however, because, as we explain, we agree with defendant that, in all events, the admission of the medical diagnosis was plain error under ORAP 5.45(1), and it is appropriate for us to exercise our discretion to correct the error.

---

[3] In his first assignment of error, defendant challenges the trial court's admission of Chervenak's testimony about the disclosure process in sexual abuse victims. In his second assignment, he contends that the court erred in admitting Chervenak's testimony regarding the "phenomenon of recanting" by sexual abuse victims. The basis for both assignments of error is that the evidence failed to meet the heightened foundational requirements for the admission of scientific evidence.

[4] *Southard* was decided after briefing in this case was complete, although both parties recognized in their briefs that the admissibility of a medical diagnosis of sexual abuse without confirming physical evidence would be governed by the Supreme Court's opinion in that case. We relate the parties' positions as they were framed at oral argument, which took place after *Southard* was decided.

[5] Defendant asserts that his objection to Chervenak's testimony on "foundational grounds" was sufficient to preserve his argument on appeal; the state disagrees, arguing, in part, that that objection

"in no way apprised the court that defendant believed that Dr. Chervenak's medical diagnosis was not scientifically valid in the absence of physical evidence or that the probative value of such evidence was outweighed by the danger of unfair prejudice. Defendant did not reference the relevant standards of assessing the validity of scientific evidence—*State v. Brown*, 297 Or 404, 687 P2d 751 (1984), or *State v. O'Key*, 321 Or 285, 899 P2d 663 (1995)—nor did he reference OEC 403, which permits a court to exclude unfairly prejudicial evidence."

■■ Ordinarily, we will not consider a claim of error on appeal that has not been presented to the trial court. ORAP 5.45(1); *see generally Peeples v. Lampert*, 345 Or 209, 219-20, 191 P3d 637 (2008) (explaining purpose behind preservation rule). However, we may reach unpreserved error if it is an "error of law apparent on the face of the record," ORAP 5.45(1), also referred to as "plain error." *See State v. Steen*, 346 Or 143, 206 P3d 614 (2009) (discussing plain error exception to preservation requirement generally). An error is "plain" for purposes of ORAP 5.45 if (1) the error is one of law; (2) the legal point is obvious—that is, "not reasonably in dispute"; and (3) to reach the error, "[w]e need not go outside the record or choose between competing inferences to find it." *State v. Brown*, 310 Or 347, 355, 800 P2d 259 (1990).

■■ Of particular significance here, given that defendant's trial occurred before *Southard* was decided, we determine "plain error" by reference to "the law existing at the time the appeal is decided," and not as of the time the allegedly erroneous ruling was rendered. *Jury*, 185 Or App at 136. Finally, even if the error qualifies as plain error, we still must decide whether to affirmatively exercise our discretion to correct the error and identify the reasons for doing so. *Ailes*, 312 Or at 382. We do so cautiously, given the important policies underlying the preservation rule. *Peeples*, 345 Or at 219.

■ For the reasons that follow, we conclude that, given *Southard*, the admission of Chervenak's diagnosis of sexual abuse constituted an "error of law apparent on the face of the record." ORAP 5.45(1). We further conclude that a variety of considerations decisively militate in favor of a positive exercise of our discretion under *Ailes* to remedy that error.

We begin with the requisites of plain error. The operative question—*viz.*, the admissibility of an expert diagnosis of sexual abuse in the absence of any physical evidence of abuse—is a question of law. Further, following *Southard*, the correct resolution of that legal question is no longer reasonably in dispute. Finally, to discern that error, we need not go outside the record or chose between or among competing inferences.

In *Southard*, as in this case, the ultimately dispositive question was "whether a diagnosis of 'sexual abuse'—*i.e.*,

a statement from an expert that, in the expert's opinion, the child was sexually abused—is admissible in the absence of any physical evidence of abuse." 347 Or at 142. There, a physician at a child abuse assessment center diagnosed the child as having been sexually abused based on the child's statements of abuse and the child's history, gathered from his mother and foster mother, including their reports that he had exhibited sexual behaviors that concerned them. A physical examination revealed no physical evidence of sexual abuse. *Id*. at 131.

The defendant was subsequently charged with two counts of sodomy involving the child. *Id*. Before trial, the defendant moved *in limine* to preclude the state from presenting evidence of the physician's diagnosis of sexual abuse. *Id*. In so moving, the defendant contended that the diagnosis was "scientific evidence" under OEC 702 but did not satisfy the foundational requirements for such evidence. The trial court denied that motion, and, at trial, the physician did, in fact, testify that she had diagnosed the child as having been sexually abused. *Id*. at 132. The jury convicted the defendant, and, on appeal, we affirmed the judgment. *Id*. at 129.

On review, the Supreme Court reversed. In doing so, however, the court began by rejecting the defendant's predominant contention that, "without physical evidence of abuse, a diagnosis of child sexual abuse is too unreliable and not sufficiently verifiable to be considered scientifically valid." *Id.* at 132. In rejecting that argument, the court first reiterated the well-established criteria for the admissibility of scientific evidence, namely, that it "must be relevant, OEC 401; it must possess sufficient indicia of scientific validity and be helpful to the jury, OEC 702; and its prejudicial effect must not outweigh its probative value, OEC 403." *Id*. at 133 (citing *Marcum v. Adventist Health System/West*, 345 Or 237, 243, 193 P3d 1 (2008), and *Jennings*, 331 Or at 301).

Applying those principles, the Supreme Court then examined the specific methodologies used by the physician and the assessment center in making the diagnosis of sexual abuse and concluded that they possessed "sufficient indicia of scientific validity," even in the absence of physical evidence of abuse, to satisfy the second criteria for admissibility.

*Southard*, 347 Or at 137. In sum, "[t]he experts were all qualified, the techniques used are generally accepted, the procedures rely on specialized literature in the field, and the procedures used are not novel. Furthermore, the [assessment center] follows numerous safeguards to enhance objectivity and increase the accuracy of the final diagnosis." *Id*.

The Supreme Court further determined that the diagnosis of child sexual abuse was relevant, reasoning, "[w]hether sexual abuse has occurred is a material fact in proving a charge of sodomy, and the doctor's diagnosis that the boy had been sexually abused increased the probability of that fact's occurrence." *Id.* at 139.

However, the Supreme Court ultimately concluded that the expert's diagnosis of sexual abuse was nonetheless inadmissible because, under OEC 403, the probative value of that evidence was substantially outweighed by the danger of unfair prejudice. *Id.* at 141. As the court observed, because the doctor's diagnosis "did not tell the jury anything that it was not equally capable of determining on its own," its probative value was "slight." *Id.* at 140. Conversely, the risk of prejudice was great:

> "The fact that the diagnosis came from a credentialed expert, surrounded with the hallmarks of the scientific method, created a substantial risk that the jury 'may be overly impressed or prejudiced by a perhaps misplaced aura of reliability or validity of the evidence.' "

*Id.* at 140-41 (quoting *State v. Brown*, 297 Or 404, 439, 687 P2d 751 (1984)). Moreover, because the diagnosis was based primarily on the doctor's assessment of the child's credibility, it "pose[s] the risk that the jury will not make its own credibility determination, which it is fully capable of doing, but will instead defer to the expert's implicit conclusion that the victim's reports of abuse are credible." *Southard*, 347 Or at 141. In those circumstances, "the risk that the jury will defer to the expert's assessment outweighs whatever probative value the diagnosis may have." *Id.* at 142.

We perceive no material legal distinction between the admissibility of the expert's diagnosis of sexual abuse in

*Southard* and the admission of the diagnosis in this case. To be sure, here Chervenak testified that her physical examination of the complainant's vaginal area and hymen revealed an "unusual appearance," due to "a couple of notches in part of her hymen." However, the import of that "non-specifically abnormal exam" was indeterminate. In particular, Chervenak testified that she "can't really tell one way or the other" and "it wasn't specifically abnormal that I know for sure there's been an injury there." Thus, by the doctor's own testimony, the physical evidence neither confirmed nor refuted a diagnosis of sexual abuse.[6]

In sum, as in *Southard*, the physician's diagnosis of sexual abuse in this case was based solely on the complainant's statements and history, without any physical evidence corroborative of the charged sexual abuse. Consequently, under "the law existing at the time the appeal is decided," *Jury*, 185 Or App at 136, it is "not reasonably in dispute" that the court erred in admitting Chervenak's diagnosis of sexual abuse, *Brown*, 310 Or at 355.

■ The state does not dispute the first two prerequisites of the *Brown* plain error formulation. However, the state does contend that the asserted error does not satisfy the third, and final, criterion. In particular, the state contends that "competing inferences" can be drawn from defendant's failure to properly object to the admission of the diagnosis on OEC 403 grounds.

As we understand it, the state's thesis is this: It is possible that defense counsel made a conscious tactical decision to address the prejudice that—according to *Southard*—arises from the low probative value of the diagnosis evidence by attacking it during cross-examination and closing argument, rather than by continuing to raise objections in front of the jury. In other words, in the state's view, the defense may have made a tactical choice not to properly object to Chervenak's diagnosis so that it could use that evidence to its own advantage during cross-examination. Thus, according to

---

[6] In all events, given the nature of the charged conduct, which did not involve penetration of the complainant's vagina, the results of the physical examination did not corroborate the alleged abuse.

the state, the error is not apparent because it requires us to "choose between competing inferences" to find the error. *See Brown*, 310 Or at 355.[7]

∎ The state's argument is unavailing, regardless of whether it is more properly directed to the third plain error prerequisite or to the proper exercise of *Ailes* discretion. *See* 234 Or App at 512 n 7. The premise of that argument—*viz.*, that defendant actually *wanted* the diagnosis testimony to be admitted so that he could savage it—is irreconcilable with what actually occurred at trial. Bluntly, "competing inferences," for purposes of the plain error analysis, must be plausible—and the inference that the state posits is not plausible.

As noted, defense counsel did, in fact, object to Chervenak's diagnosis testimony, asserting that that testimony should not be admitted because of "no foundation." *See* 234 Or App at 506. That action completely contradicts the premise that defendant actually *wanted* to have that testimony admitted, as a foil for cross-examination. In other words, if that were defendant's strategy, defendant would not have objected at all, rather than make an incomplete or, in the state's view, incorrect objection. Thus, the tactical reason posited by the state for defendant's failure to specifically object to the diagnosis on OEC 403 grounds is implausible.

▬▬▬ In sum, we conclude that the requirements for plain error review have been satisfied in this case. We turn to the factors that properly bear on our exercise of our discretion to remedy the unpreserved error on appeal. Those factors include

> "the competing interests of the parties; the nature of the case; the gravity of the error; the ends of justice in the particular case; how the error came to the court's attention; and whether the policies behind the general rule requiring

---

[7] The state's argument in that regard partakes of the analysis of *State v. Gornick*, 340 Or 160, 169-70, 130 P3d 780 (2006) (error not apparent where the defendant expressly consented to waiver of jury and competing inferences could be drawn from the defendant's failure to object to the court's imposition of an upward departure sentence on the basis of facts neither admitted nor found by a jury). *But cf. State v. Fults*, 343 Or 515, 523, 173 P3d 822 (2007) (addressing the defendant's "strategic choice not to object to the sentence" as a consideration pertaining to exercise of *Ailes* discretion).

preservation of error have been served in the case in another way[.]"

*Ailes*, 312 Or at 382 n 6.

We determine that several considerations conclusively militate in favor of correcting the error in this case. Most importantly, as *Southard* itself makes clear, the gravity of the error is substantial. The issue of the complainant's credibility was critical to the outcome of this case. The core of the state's case was the complainant's allegations—which she later fully recanted—and Chervenak's expert diagnosis. Given the complainant's recantation, the jury was ultimately called upon to determine whether she was telling the truth, or being untruthful, when she made her initial allegations—and, conversely, whether her recantation was truthful or untruthful. Necessarily implicit in the erroneously admitted diagnosis was Chervenak's conclusion that at least some of the complainant's initial disclosures were more credible than her later recantation.

As *Southard* warns, there is a substantial risk that the jury " 'may be overly impressed or prejudiced by a perhaps misplaced aura of reliability or validity of the [expert] evidence' "—and, thus, improperly defer to the expert's assessment of credibility rather than making its own independent determination. 347 Or at 141 (quoting *Brown*, 297 Or at 439). Consequently, there was a substantial prospect in this case that the jury, in rendering its verdict, deferred improperly to Chervenak's diagnosis. *See, e.g.*, *State v. Page*, 197 Or App 72, 83, 104 P3d 616 (2005), *rev den*, 340 Or 673 (2006) (exercising our discretion to review unpreserved error when the erroneously admitted evidence was a crucial part of the state's case); *cf. State v. Ramirez*, 343 Or 505, 513-14, 173 P3d 817 (2007), *adh'd to as modified on recons*, 344 Or 195, 179 P3d 673 (2008) ("ends of justice" would not be advanced by "plain error"-based remand under *Blakely v. Washington*, 542 US 296, 124 S Ct 2531, 159 L Ed 2d 403 (2004), where there was overwhelming evidence in support of the departure factors relied on by the trial court).

The state disagrees, pointing to the fact that the jury acquitted defendant on *some* charges, albeit convicting on others. According to the state, the verdict thus demonstrates

that the jury made its own credibility determinations and was not unfairly prejudiced by the admission of Chervenak's diagnosis. In other words, in the state's view, the risk articulated in *Southard*—that the jury would improperly defer to the expert evidence—was not realized in this case.

We reject the state's premise. Chervenak diagnosed the complainant as having been sexually abused; she did not detail the specific acts correlating to that abuse. The jury convicted defendant of 16 counts of sexual abuse. It does not follow, simply because the jury acquitted defendant of other counts—which, incidentally, were not denominated "sexual abuse"—that the jury was not prejudicially influenced by the erroneously admitted expert opinion in convicting defendant on the sexual abuse charges.[8]

Further, considering and correcting the error here will not undermine the "record-development" function of the preservation doctrine. As explained above, defendant did object, albeit without invoking OEC 403, to the admission of the diagnosis testimony. We do not perceive how or why, even if defendant had also explicitly raised an OEC 403 objection, and had framed his argument in the terms that the Supreme Court ultimately, essentially categorically, adopted in *Southard*, the evidentiary record in this case would have developed any differently.

Finally, the error is not insignificant. Defendant was convicted of 16 counts of first-degree sexual abuse, a Measure 11 offense, and sentenced to 225 months of potentially unlawful incarceration. Given those consequences, and the palpable potential for improper prejudice, the "ends of justice" favor our exercise of *Ailes* discretion in this case.

Reversed and remanded.

---

[8] As defendant suggests, it is possible that the jury convicted defendant of the sexual abuse charges, yet acquitted him of the sodomy-related and incest charges, because the complainant almost immediately recanted the latter charges, while continuing to assert that defendant engaged in the conduct forming the basis for the sexual abuse charges. It was only later that the complainant fully recanted all of the allegations.