Submitted August 13, reversed November 10, 2010

In the Matter of G. L.,
Alleged to be a Mentally Ill Person.

## STATE OF OREGON,
*Respondent,*

*v.*

## G. L.,
*Appellant.*

Jackson County Circuit Court
09118MC; A141782

243 P3d 469

Charles Kochlacs filed the brief for appellant.

John R. Kroger, Attorney General, Jerome Lidz, Solicitor General, and Michael R. Washington, Senior Assistant Attorney General, filed the brief for respondent.

Before Haselton, Presiding Judge, and Armstrong, Judge, and Duncan, Judge.

DUNCAN, J.

## DUNCAN, J.

This is a civil commitment case in which appellant seeks reversal of the trial court's judgment adjudicating her to be mentally ill and committing her to the Mental Health Division. ORS 426.130(1)(b)(C) (2007).[1] Appellant asserts there was insufficient evidence to support the trial court's decision that, because of a mental disorder, she was "[u]nable to provide for basic personal needs and [was] not receiving such care as is necessary for health or safety." ORS 426.005(1)(d)(B). On *de novo* review, ORS 19.415 (2007),[2] we agree that there was insufficient evidence that appellant was unable to provide for her basic needs and, therefore, reverse.[3]

The relevant facts are as follows. At the beginning of March 2009, appellant was a 25-year-old university student. She and her two-year-old daughter lived together in an apartment in Ashland. They had lived in the apartment for over a year. Appellant received food stamps and student loans. Appellant's parents lived nearby and helped care for appellant's daughter.

Appellant was diagnosed with bipolar disorder in November 2007. She received treatment from a psychiatric nurse, Nielsen, who prescribed her Lithium. According to Nielsen, appellant was "very stable" when she was on her medication; appellant was an excellent student and was able to successfully manage work and parenting duties while in school. According to appellant's father, appellant had always been a very organized person and had always done well in school. Appellant's father noticed changes in appellant's

---

[1] Portions of ORS chapter 426 were amended in 2009. Or Laws 2009, ch 595. This commitment action was initiated before those amendments went into effect. Accordingly, all citations in this opinion are to the 2007 version of the Oregon Revised Statutes.

[2] ORS 19.415 was amended by Senate Bill 262 (2009). Or Laws 2009, ch 231, §§ 2-3. The amendments apply to appeals in which the notice of appeal was filed on or after June 4, 2009. Because the notice of appeal in this case was filed before that date, the amendments do not apply.

[3] As explained below, appellant asks us to reverse on the basis of plain error, and we do. For that reason, we need not address what, if anything, appellant needed to do beyond opposing the commitment to preserve her challenge to the legal sufficiency of the state's evidence for commitment.

behavior in the beginning of March 2009. According to appellant's father, appellant became "vulgar, accusatory, and * * * unfocused."

On the night of March 15, 2009, Officer Cromwell came to appellant's apartment to investigate a case of telephonic harassment between appellant and her ex-husband. Cromwell arrived between 9:30 and 10:00 p.m., and appellant's daughter was asleep in bed. Appellant stepped outside to speak with Cromwell, and the apartment door locked behind her. Cromwell questioned appellant about the telephonic harassment and found her answers nonresponsive. According to Cromwell, appellant giggled and laughed inappropriately. Cromwell thought appellant might have been intoxicated.

Cromwell decided to arrest appellant for telephonic harassment. Cromwell told appellant she was going to be taken to jail and she needed to find someone to care for her daughter. Appellant had trouble focusing and was uncooperative. She would not say whether there was anyone else who had a key to the apartment or who could care for her daughter. Cromwell had the apartment manager unlock the apartment. Inside, Cromwell found appellant's daughter asleep in bed. She also found a phone number for appellant's mother, who came to care for appellant's daughter. Cromwell took appellant to jail.

Appellant was released from jail the next day, March 16. She and her father went to see Nielsen. Appellant told Nielsen that she had stopped taking her medication. According to Nielsen, appellant seemed "a little argumentative" and "a little bit obstinate." She also laughed inappropriately at times.

The following week, appellant's parents initiated a civil commitment proceeding. ORS 426.070(1)(a). On March 25, a mental health investigator, Ortiz, interviewed appellant and found her "very pressured and labile, angry." According to Ortiz, appellant was rude and sarcastic; she refused to answer some of Ortiz's questions, saying Ortiz already had the information she was asking for. Appellant told Ortiz that she did not want to take her medication because it "slowed her down." Ortiz asked appellant if she was suicidal, and

appellant replied she was not suicidal, but she was "homicidal." She said her ex-husband had threatened her with a knife and she wanted to kill him.

Later that day, appellant drove to Mt. Shasta, left her car on the side of the interstate with the keys inside, and walked a quarter mile to a highway patrol station. An officer called appellant's parents, and appellant's father came to pick up appellant.

The following day, March 26, Ortiz filed a report recommending that the trial court issue an order to hold appellant at a hospital pending a civil commitment hearing. ORS 426.070(4), (6). The report stated that appellant had a mental disorder, was dangerous to herself and others, and was unable to provide for her basic needs. Later that day, a sheriff's deputy took appellant into custody and transported her to a hospital.

On March 29, Genack, a psychiatrist serving as the mental health examiner for the commitment proceeding, met with appellant at the hospital. He concluded that appellant had a mental disorder, but that she was not a danger to herself or others and that she was able to provide for her basic needs. In a written report, Genack stated that, when he met with appellant, she was "alert and cooperative, * * * oriented to time, place, person and situation." "Her mood [was] midrange, her thinking [was] linear." Appellant believed she would "benefit from psychological counseling," and her "insight [was] fair, judgment [was] intact, and [there was] no evidence of cognitive impairment." Genack further reported that appellant's behavior in the hospital indicated that she was not a danger to herself or others. According to Genack, appellant "exhibited adequate frustration tolerance in a frustrating environment."

On March 30, the trial court held a commitment hearing. Appellant's father testified about how appellant's behavior had changed since the beginning of March. In addition, appellant's father reported that appellant had gone to Boston for a student conference, but had walked around the city instead of attending the conference and had incurred a large bill at her hotel. When appellant returned from the trip, she failed to take her final examinations. After her arrest, appellant was particularly disorganized; she lost her purse,

phone, and car keys. Appellant's father expressed concern about appellant's ability to care for herself; he testified that, when he picked up appellant after she drove to Mt. Shasta, "She did not smell very good. I don't know when the last time she had had a shower." Appellant's father testified that, to his knowledge, appellant had never threatened harm to herself or anyone else and she had never attempted to cause anyone physical harm. Appellant's father also testified that he and appellant's mother had been taking care of appellant's daughter since appellant's arrest, with the involvement and approval of the state's child welfare agency.

Nielsen, appellant's treatment provider, testified that appellant had not expressed suicidal thoughts and that she was not a danger to others. Nielsen explained that, when she saw appellant after she had stopped taking her medication, appellant was "argumentative, but that's not a danger to others."

Genack, the mental health examiner, testified that, although appellant had a mental disorder and possibly an alcohol abuse issue, she did not meet the statutory criteria for commitment. He explained:

"[S]he does have ongoing mental problems that do need care including counseling and follow-up—psychiatric follow-up. I just don't feel that she meets the criteria—I don't feel that she's an acute danger to herself or others based on her—the level of stability that she's had here on the unit."

Genack further testified that appellant was able to provide for her basic needs.

Ortiz, the mental health investigator, testified that appellant probably would not be able to meet her basic needs without support from her parents:

"I think on her own she probably wouldn't be able to meet her needs. I mean, her parents are helping her. But without that support * * * I think she would decompensate further, especially with her * * * continuation to refuse medication."

Ortiz also testified that appellant would not be able to care for her daughter, stating:

"From the * * * reports of what I've heard, I don't think she would be able to care for her two-year-old daughter. And

that would be the danger to others. You know, locking her two-year-old inside the house and not being cooperative with the police."

Further, Ortiz testified that

"on two occasions at her house I did offer her * * * some help with getting started on her medications, or kind of coordinating that, and also in the hospital I did offer her that and she refused. She said she did not want to take her Lithium or any other medication because it slows her down."

The trial court held that appellant was not a danger to herself or others, but that she was unable to provide for her basic needs. The court explained:

"I don't find that the Petitioners have proven by clear and convincing evidence that [appellant] either presents a danger to herself or presents a danger to others.

"However, I do find that it has been proven that [appellant] is unable to care for her basic personal needs to the extent not likely to survive in the near future. Certainly it seems that she is not really cognizant of her natural surroundings, her natural schooling, her responsibilities.

"I heard some—some testimony about hygiene, and I consider basic personal needs to also include * * * taking medication as prescribed, which she doesn't—did not appear to be doing. And certainly the testimony is pretty overwhelming that when she is on her medication, she seems to be doing quite well. But as of late, and she has self admitted she has not been taking the medication, she has deteriorated.

"So I do find * * * that that part of the statute has been proven based upon clear and convincing evidence."

The court also held that appellant would not cooperate with and benefit from a program of voluntary treatment. The court explained that appellant "was given a couple of opportunities to participate in treatment on a voluntary basis and did not agree to that."

■     As mentioned, appellant challenges the trial court's order of commitment, arguing that there was insufficient evidence to support the trial court's conclusion that appellant was unable to provide for her basic needs. Appellant asks us

to reverse that decision as "error apparent on the face of the record." ORAP 5.45(1).[4] The state does not dispute appellant's claim that there was insufficient evidence to support the trial court's conclusion that appellant was unable to provide for her basic needs. The state's only argument on appeal is that we should not review the decision as "error apparent on the face of the record."

We turn first to appellant's argument that there was insufficient evidence for the trial court to commit her. A court has authority to commit a person if the state presents "clear and convincing" evidence that the person is "mentally ill." ORS 426.130.[5] A "mentally ill" person is "a person, who, because of a mental disorder" is "dangerous to self or others," is "unable to provide for basic personal needs and is not receiving such care as is necessary for health or safety," or, under certain circumstances, has "a chronic mental illness." ORS 426.005(1)(d).[6] As we have emphasized, the standard of

---

[4] ORAP 5.45(1) provides, in part:

"No matter claimed as error will be considered on appeal unless the claim of error was preserved in the lower court * * *, provided that the appellate court may consider an error apparent on the face of the record."

[5] ORS 426.130(1) provides:

"After hearing all of the evidence, and reviewing the findings of the examining persons, the court shall determine whether the person is mentally ill. If, in the opinion of the court, the person is:

"* * * * *

"(b) Mentally ill based upon clear and convincing evidence, the court:

"* * * * *

"(C) May order commitment of the individual to the Department of Human Services for treatment if, in the opinion of the court, subparagraph (A) or (B) of this paragraph is not in the best interest of the mentally ill person. If the court orders commitment under this subparagraph:

"(i) The court shall establish a period of commitment.

"(ii) The department may place the committed person in outpatient commitment under ORS 426.127."

[6] ORS 426.005(1)(d) provides:

" 'Mentally ill person' means a person who, because of a mental disorder, is one or more of the following:

"(A) Dangerous to self or others.

"(B) Unable to provide for basic personal needs and is not receiving such care as is necessary for health or safety.

"(C) A person:

"(i) With a chronic mental illness, as defined in ORS 426.495;

proof for commitment is quite exacting. To be "clear and convincing," evidence must be of "extraordinary persuasiveness." *State v. Howell*, 53 Or App 611, 617, 633 P2d 14 (1981).

■■    As described, the trial court committed appellant on the ground that she was unable to provide for her basic needs. ORS 426.005(1)(d)(B). " 'Basic needs' are those things necessary to sustain life." *State v. Brungard*, 101 Or App 67, 71, 789 P2d 683, *modified on recons*, 102 Or App 509, 794 P2d 1257 (1990), *rev den*, 311 Or 427 (1991). To commit a person on the ground that the person is unable to provide for "basic needs,"

> "[t]he state must establish by clear and convincing evidence that the individual, due to a mental disorder, is unable to obtain some commodity (*e.g.*, food and water) or service (*e.g.*, life-saving medical care) without which he cannot sustain life."

*State v. Bunting*, 112 Or App 143, 145, 826 P2d 1060 (1992). The state must present more than evidence of "speculative threats to safe survival." *State v. M. C.*, 227 Or App 530, 534, 206 P3d 1096 (2009). It must present evidence that "there is a likelihood that the person probably would not survive in the near future" because of the person's inability to provide for basic needs. *Bunting*, 112 Or App at 146.

■    A person's failure to take medication for a mental disorder is not a basis for a "basic needs" commitment unless it creates an imminent threat to the person's life. *See, e.g.*, *State v. A. M.-M.*, 236 Or App 598, 601, 238 P3d 407 (2010) (evidence that the appellant's failure to take his medication for schizophrenia caused him to be delusional and, as a result, engage in self-harming behavior—specifically, attempting to "push[ ] glass through a wall"—was insufficient to support a commitment on the ground that he was

---

"(ii)  Who, within the previous three years, has twice been placed in a hospital or approved inpatient facility by the department under ORS 426.060;

"(iii)  Who is exhibiting symptoms or behavior substantially similar to those that preceded and led to one or more of the hospitalizations or inpatient placements referred to in sub-subparagraph (ii) of this subparagraph; and

"(iv)  Who, unless treated, will continue, to a reasonable medical probability, to physically or mentally deteriorate so that the person will become a person described under either subparagraph (A) or (B) of this paragraph or both."

unable to provide for his basic needs); *State v. Baxter*, 138 Or App 94, 906 P2d 849 (1995) (evidence that appellant had stopped taking his medication for schizophrenia and would likely be homeless if not committed, and that, when appellant had been homeless before, he suffered from dehydration, was insufficient to support a "basic needs" commitment); *Brungard*, 101 Or App at 71 (appellant's failure to take Lithium for bipolar disorder was "not shown to be *immediately* threatening, even when coupled with irregular sleeping and eating" (emphasis in original)).

In this case, there was insufficient evidence that appellant was unable to provide for her basic needs. She had access to food and shelter. She received food stamps and was renting an apartment. There was no evidence that she was at risk of losing either or that, if she did, she would be unable to secure alternative sources for food and shelter. She also had medical care, including psychiatric care from Nielsen. Appellant had stopped taking her medication, and her behavior had changed, but there was no evidence that her life was at risk; there was no evidence that she "probably would not survive in the near future." *Bunting*, 112 Or App at 146.

Thus, there was insufficient evidence that appellant was unable to provide for her basic needs. As noted, the state does not contend otherwise. The state's only argument on appeal is that we should not review the trial court's decision that appellant was unable to provide for her basic needs as "plain error."

■■ We may review an error as "plain error" if (1) the error is one of law; (2) the legal point is "not reasonably in dispute"; and (3) to reach the error, "[w]e need not go outside the record or choose between competing inferences to find it." *State v. Brown*, 310 Or 347, 355, 800 P2d 259 (1990). If an error satisfies the three plain error requirements, we must decide whether to exercise our discretion to correct the error and identify the reasons for doing so. *Ailes v. Portland Meadows, Inc.*, 312 Or 376, 381-82, 823 P2d 956 (1991).

The state does not dispute that the first two plain error requirements are satisfied; specifically, it does not dispute that committing a person based on insufficient evidence is a legal error or that there was insufficient evidence in this

case. The state's only argument concerns the third require-
ment. The state argues that "competing reasonable infer-
ences could be drawn from the record as to whether the trial
court's finding [that appellant was unable to provide for her
basic needs] was error" because it is possible that "appellant
consciously *chose* not to object to that finding at her mental
commitment hearing." (Emphasis in original.) Specifically,
the state argues:

> "Appellant could have decided not to object to the trial
> court's finding that she was unable to provide for her basic
> personal needs by reasoning that had she done so, the state
> could have made additional arguments supporting a find-
> ing that she was a danger to others or a danger to herself."

The state continues:

> "If appellant were found to be a danger to herself or a dan-
> ger to others, she could have been prohibited from pur-
> chasing or possessing a firearm under ORS 426.130(1)(D).
> Another reason appellant may have consciously decided not
> to object to the trial court's finding is that the impact to her
> would be less if she were found unable to provide for her
> basic personal needs than if she were found to be a danger
> to others or to herself. Appellant arguably could be in
> greater jeopardy of losing custody of her child if she were
> found to be a danger to others than if she were found unable
> to provide for her basic personal needs."

Thus, the state suggests that appellant might have
considered the consequences of being committed based on dif-
ferent grounds and concluded that (1) it was better to be com-
mitted on the ground she was unable to provide for her basic
needs than on the ground that she was dangerous to herself
or others, (2) being committed on the ground she was unable
to provide for her basic needs would protect her against being
committed on the ground she was dangerous to herself or oth-
ers, and (3) there was a risk that she would be committed on
the ground she was dangerous to herself or others.

We reject the state's argument. " 'Competing infer-
ences,' for the purposes of the plain error analysis, must be
plausible," *State v. Lovern*, 234 Or App 502, 512, 228 P3d 688
(2010), and the state's suggestion that appellant may have

consciously chosen to be committed on insufficient evidence is simply not.

The state's suggestion fails for several reasons. First, even assuming appellant might have considered the consequences of being committed on different grounds and concluded, as the state suggests, that it would be better to be committed on the ground she was unable to provide for her basic needs rather than on the ground that she was dangerous to herself or others, it is unlikely that appellant would have chosen not to object to commitment on one ground in order to protect against commitment on other grounds. A court can commit a person on multiple grounds; therefore, being committed on one ground provides little or no protection against being committed on additional grounds.

Second, even assuming appellant might have decided that being committed on the ground she was unable to provide for her basic needs would protect her against being committed on the ground she was dangerous to herself or others, it is unlikely she would have thought she needed such protection given the limited evidence she was a danger to herself or others.[7]

Third, and finally, even assuming appellant might have decided both that being committed on the ground she was unable to provide for her basic needs would protect her against the risk of being committed on the ground she was a danger to herself or others and that she needed to protect against that risk, that risk ceased to exist when the trial court specifically stated that the state had not proved that appellant was a danger to herself or others. At that point, appellant would have had no reason to stand silent and be

---

[7] There was no evidence that appellant had engaged in any self-harming or suicidal thoughts or actions. And, there was little evidence she was a danger to others. Ortiz testified that appellant had threatened to kill her ex-husband, but a verbal threat alone cannot serve as the basis for a commitment, unless it is "accompanied by overt acts to follow through with the threat or otherwise demonstrate a clear risk of future violence." *State v. C. S.*, 228 Or App 725, 729, 208 P3d 1009 (2009). Here, there was no evidence that appellant would have acted on her threat. Ortiz also testified that she doubted appellant would have been able to care for her daughter, but Ortiz's doubt relates to whether appellant should have had custody of her daughter, not to whether the state should have had custody of appellant. There was no evidence that, if left in the community, appellant posed an affirmative danger to others, including her daughter.

committed, on insufficient evidence, on the remaining ground. Therefore, the state's suggestion that appellant might have consciously chosen not to challenge the sufficiency of the evidence on which the court committed her is implausible.

■      The only remaining question is whether we should exercise our discretion to review the trial court's commitment decision. When determining whether to exercise our discretion to review a plain error, we may consider:

> "the competing interests of the parties; the nature of the case; the gravity of the error; the ends of justice in the particular case; how the error came to the court's attention; and whether the policies behind the general rule requiring preservation of error have been served in the case in another way, *i.e.*, whether the trial court was, in some manner, presented with both sides of the issue and given an opportunity to correct any error."

*Ailes*, 312 Or at 382 n 6. Here, those factors weigh in favor of reviewing the error. Appellant was committed on the basis of insufficient evidence. The consequences of commitment, both immediate and long-term, are significant. Commitment deprives a person of his or her constitutionally protected liberty interest, *State v. C. R.*, 216 Or App 395, 400, 173 P3d 836 (2007), and carries "deleterious collateral effects," including "a social stigma * * * which affects the person's reputation and earning potential." *State v. Van Tassel*, 5 Or App 376, 385, 484 P2d 1117 (1971). Appellant has a strong interest in having the wrongful commitment reversed, and the state has asserted no interest in preserving it. In addition, the purposes of preservation were served; the state and the trial court were fully aware of the issue appellant asks us to review. The state presented evidence and argument regarding whether appellant was able to provide for her basic needs, and the trial court considered that evidence and, erroneously, held that she was not. Accordingly, we exercise our discretion to remedy the error and reverse.

Reversed.