Argued and submitted March 21, affirmed December 5, 2012

STATE OF OREGON,
*Plaintiff-Respondent*,

*v.*

JOHN ALLEN OVENDALE,
*Defendant-Appellant.*

Marion County Circuit Court
09C48935; A146835

292 P3d 579

Jason E. Thompson argued the cause for appellant. With him on the brief was Ferder Casebeer French & Thompson, LLP.

Pamela J. Walsh, Assistant Attorney General, argued the cause for respondent. With her on the brief were John R. Kroger, Attorney General, and Anna M. Joyce, Solicitor General.

Before Armstrong, Presiding Judge, and Haselton, Chief Judge, and Duncan, Judge.

ARMSTRONG, P. J.

**ARMSTRONG, P. J.**

Defendant appeals a judgment of conviction for one count of first-degree sodomy, ORS 163.405, and one count of first-degree sexual abuse, ORS 163.427. He raises four assignments of error, all but one of which we reject without discussion. We write to address only defendant's contention that the trial court erred in admitting a diagnosis of "sexual abuse" into evidence during his jury trial. Defendant argues that, under *State v. Southard*, 347 Or 127, 218 P3d 104 (2009), a diagnosis of "sexual abuse" is never admissible in a criminal prosecution for sexual abuse. Alternatively, he argues that such a diagnosis is admissible only when supported by physical findings of an injury on the body of the alleged victim. We conclude that *Southard* did not bar the admission of the diagnosis and, accordingly, affirm.

Because defendant was convicted by a jury, we summarize the facts in the light most favorable to the state. *State v. Vidal*, 245 Or App 511, 513, 263 P3d 364 (2011), *rev den*, 351 Or 761 (2012). The facts underlying defendant's conviction involve multiple episodes of abuse, involving different children. We set out only the facts necessary to address defendant's remaining assignment of error.

One evening while his fiancée was at work, defendant was watching her 4-year-old son, A. When A's mother returned home at approximately 11:00 p.m., she found A awake and downstairs with defendant, which was unusual. A's mother took A upstairs into his bedroom to put him to bed. There, A told her that defendant had "put his peepee inside of his bottom." A's mother "freaked out" and took A into her bedroom, where, in front of her mirrored closet doors, she found fecal matter on the floor. A's mother asked A what had happened, and A demonstrated that he had been on the bedroom floor, on all fours, and explained that defendant had assaulted him, that it had hurt, and that it "made him poop."

A's mother went downstairs and confronted defendant with A's statements. Then, in front of A, defendant called the whole episode a misunderstanding. He said that A had wet his pants in the car, that defendant had given A a bath, and that A was probably talking about defendant's actions in cleaning up after that accident. By that time, A's

mother was noticeably upset and crying, and A said that he might have been mistaken. A's mother was suspicious of defendant's explanation, however, knowing that A had been potty trained for "quite some time"; she checked A's clothing and car seat, and they were dry. A continued to vacillate on whether the abuse had occurred, but, after his mother stressed the importance of telling the truth, he ultimately confirmed that the assault had occurred.

That night, A's mother took him to the emergency room. There, a doctor performed a brief visual examination and saw no signs of trauma. He explained, however, that the rectum expands to let large objects pass and, therefore, that the type of abuse described by A would not necessarily cause any physical trauma. The following day, after observing orange discoloration in A's stool, A's mother again took him to the emergency room. The same doctor performed a second examination, consisting of a rectal examination and chemical test of A's stool. Neither examination revealed blood or signs of trauma.

Thereafter, a nurse practitioner at Liberty House examined A and found no physical irregularities or signs of trauma.[1] Following the examination, the nurse observed another Liberty House employee conduct an interview with A, where A again stated that defendant had anally penetrated him and that "poop" had come out. The nurse also spoke with A's mother, who confirmed that she had found feces on the bedroom floor. Ultimately, the nurse diagnosed A with "sexual abuse," relying upon A's statements and the fact that A had defecated on the floor.

Defendant was charged with one count of first-degree sodomy and four counts of first-degree sexual abuse. Two of the counts—one count of first-degree sodomy and one count of first-degree sexual abuse—arose out of defendant's abuse of A. Defendant pleaded not guilty to all counts and proceeded to a jury trial.

At trial, A testified to spare, but consistent, details of the sexual abuse. He testified that defendant had touched

---

[1] Liberty House is a child abuse assessment center. It conducts medical examinations and video-taped interviews of children suspected of suffering abuse.

him in the "back side" with his "wiener" while they were upstairs in his mother's bedroom. He testified that he and defendant had been naked and that he had defecated on the floor. A confirmed that, although he could remember only "a little" about the incident, he could confidently tell the jury that the abuse had occurred and that he had an independent memory of the events.

Given the absence of discernible physical trauma during A's medical evaluations, the fecal matter that A's mother discovered on her bedroom floor gained heightened significance at trial. The nurse practitioner, who had examined A at Liberty House, testified that she had found it "interesting and somewhat concerning" that feces had been found on the bedroom floor. She explained that any stimulation of the rectal muscles can elicit a bowel movement if there is stool in the rectum. Given that A had no prior history of defecating in inappropriate places, the nurse explained that she found the fecal matter "concerning that something had happened to his anal area."

Likewise, the emergency room doctor who initially examined A acknowledged that the fecal matter was potential physical evidence that something had penetrated A's anus. The doctor testified that he had not found the fecal matter relevant during his initial examination of A, but acknowledged that anal penetration may stimulate the rectal muscles and cause a bowel movement. He testified that he had not considered that possibility at the time of his initial examination.

The state ultimately sought to admit the Liberty House nurse practitioner's diagnosis of sexual abuse as to A. Defendant objected, arguing that, under *Southard*, a medical expert cannot give a diagnosis of sexual abuse in the absence of *physical findings of an injury*. In response, the state argued that *Southard*'s holding was narrow; the Supreme Court addressed only "whether a diagnosis of 'sexual abuse'—*i.e.*, a statement from an expert that, in the expert's opinion, the child was sexually abused—is admissible in the absence of any *physical evidence of abuse*." 347 Or at 142 (emphasis added). The state argued that the

fecal matter on the floor constituted "physical evidence of abuse" and, therefore, that the nurse practitioner's diagnosis fell outside of *Southard*'s holding.

In the subsequent colloquy, the nurse confirmed that she had reached a diagnosis of "sexual abuse," based on A's medical history—as reflected in the statements of A and his mother—and on the fecal matter found on A's mother's bedroom floor. Ultimately, the trial court allowed the diagnosis, after examining its basis:

"[Court:]   So your opinion is based upon, one, the child's statements, and, two, the fact that the child pooped on the floor.

"[Nurse:]   Yes.

"[Court:]   I'll allow it. I think the poop on the floor goes beyond [*Southard*]."

The nurse then testified that she had diagnosed A with "sexual abuse" after her examination of him.

The jury ultimately convicted defendant of one count of first-degree sodomy, for the sexual assault of A, and one count of first-degree sexual abuse, for the abuse of another child. The jury found defendant not guilty of first-degree sexual abuse of A, which the state had presented as an alternative theory to the count of sodomy. Defendant successfully moved for a judgment of acquittal on his remaining two charges.

On appeal, defendant contends that, under *Southard*, the nurse practitioner's diagnosis of "sexual abuse" was inadmissible. He does so in two ways. First, he contends that *Southard*, properly read, precludes the admission of *any* diagnosis of "sexual abuse," whether or not that diagnosis is supported by physical evidence. Alternatively, he contends that, even if a diagnosis is admissible when supported by "physical evidence," that "physical evidence," as the Oregon Supreme Court contemplated in *Southard*, refers only to physical evidence of an injury found *on the body* of the alleged victim. We disagree and, for the reasons that follow, affirm.

Before addressing defendant's arguments, an explanation of the Supreme Court's analytical framework in *Southard* is in order.[2] In *Southard*, the Supreme Court ultimately held that a physician's diagnosis that a child had been sexually abused was inadmissible when there was no physical evidence of abuse. *Id.* at 142. In reaching that holding, the Supreme Court grounded its analysis in familiar evidentiary terms: to be admissible, a diagnosis of sexual abuse—or any scientific evidence—must satisfy three criteria. *Id.* at 133. First, the diagnosis must be relevant. *Id.*; OEC 401. Second, the diagnosis must possess sufficient indicia of scientific validity, and it must be helpful to the jury. *Southard*, 347 Or at 133; OEC 702. And, third, the prejudicial effect of the diagnosis must not outweigh its probative value. *Southard*, 347 Or at 133; OEC 403. In applying that framework, the Supreme Court concluded that the diagnosis in *Southard* was relevant and possessed sufficient indicia of scientific validity. 347 Or at 138-39. Nevertheless, the Supreme Court held that the diagnosis was unduly prejudicial under OEC 403 and, therefore, inadmissible. *Southard*, 347 Or at 140-41.

The court expressed its ultimate holding in three—now oft-quoted—sentences:

"Our holding today is narrow. The only question on review is whether a diagnosis of 'sexual abuse'—*i.e.*, a statement from an expert that, in the expert's opinion, the child was sexually abused—is admissible in the absence of any physical evidence of abuse. We hold that where, as here, that diagnosis does not tell the jury anything that it could not have determined on its own, the diagnosis is not admissible under OEC 403."

*Id.* at 142.

With that in mind, we turn to defendant's primary argument on appeal, *viz.*, that *Southard*, properly understood, precludes the admission into evidence of any diagnosis of "sexual abuse," whether or not that diagnosis is supported by physical evidence. Relying on the third

---

[2] We have now had several occasions to analyze the Supreme Court's opinion in *Southard*, and we see no need to reproduce that discussion here. For a more thorough discussion of the background of *Southard* and the court's reasoning within each analytical step, see *State v. Lovern*, 234 Or App 502, 228 P3d 688 (2010).

sentence of the Supreme Court's holding, defendant argues that "the holding of *Southard* is that a diagnosis of 'sexual abuse' does not add anything to aid the jury's deliberations, other than to allow one witness to bolster the credibility of another witness." We disagree.

We first note that defendant's argument is a dramatic departure from both the Supreme Court's and this court's understanding of *Southard*'s rule, as demonstrated in subsequent articulations of the court's holding. That is to say, both courts have consistently recognized that *Southard* proscribes only the admission of diagnoses of "sexual abuse" that are not supported by physical evidence. For example, in *State v. Lupoli*, 348 Or 346, 357, 234 P3d 117 (2010), the Supreme Court characterized *Southard*'s holding as follows:

> "[A] statement from an expert that, in the expert's opinion, a child had been sexually abused *was inadmissible in the absence of physical evidence of abuse*, because it does not tell the jury anything that the jury could not have determined on its own, and, therefore, the probative value of any such testimony is outweighed by the danger of unfair prejudicial effect under OEC 403."

(Emphasis added.) We also have repeatedly characterized *Southard* in the same manner. *See, e.g.*, *Vidal*, 245 Or App at 515 ("*Southard* itself announced a rule that concerned an expert medical diagnosis of sexual abuse *'in the absence of any physical evidence of abuse,'* and it narrowly limited its holding to those circumstances." (Quoting *Southard*, 347 Or at 142.) (Emphasis added.)); *State v. Lovern*, 234 Or App 502, 508-09, 228 P3d 688 (2010) (same). In doing so, we have nonetheless assumed that *Southard* left open the question whether OEC 403 would require exclusion of a diagnosis of "sexual abuse" that is supported by physical evidence in some circumstances. *Vidal*, 245 Or App at 517.

We reaffirm that understanding today, and, to illustrate why, we turn to the court's analysis in *Southard*, which, as relevant here, involved a standard application of the well-settled balancing test found in OEC 403. OEC 403 provides:

> "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading

the jury, or by considerations of undue delay or needless presentation of cumulative evidence."

*See, e.g., State v. Brown,* 279 Or 404, 438-42, 687 P2d 751 (1984) (applying test).

Applying that test in *Southard,* the court began by determining the probative value of the physician's diagnosis of "sexual abuse." In doing so, the court first noted that the diagnosis did not tell the jury anything that it was not equally capable of determining on its own. That observation, in turn, sprang from two premises. First, the particular diagnosis of "sexual abuse" at issue in *Southard* did not present a "complex factual determination that a lay person cannot make as well as an expert." *Southard,* 347 Or at 140. Instead, the physician's diagnosis rested entirely upon the credibility of the child's reports of abuse. Second, in making her diagnosis, the physician considered "the same criteria that we expect juries to use every day in courts across [the] state to decide whether witnesses are credible." *Id.* From that foundation, the court went on to reason that, "[b]ecause the doctor's diagnosis * * * did not tell the jury anything that it was not equally capable of determining, the marginal value of the diagnosis was slight." *Id.*

Against that slight probative value weighed a substantial risk of prejudice. The diagnosis came from a credentialed expert and created the risk that the jury would be "'overly impressed or prejudiced by a perhaps misplaced aura of reliability or validity of the evidence[.]'" *Id.* at 140-41 (quoting *Brown,* 297 Or at 439 (alteration in *Southard*)). Moreover, because the diagnosis was based on the physician's credibility determination of the child's reports of abuse, the admission of the diagnosis "posed the risk that the jury w[ould] not make its own credibility determination" but would, instead, defer to the expert's implicit conclusion that the child was credible. *Id.* at 141. Thus, the court concluded that the risk of prejudice substantially outweighed the slight probative value of the diagnosis. *Id.* The court then summarized its holding: "[W]here, as here, that diagnosis does not tell the jury anything that it could not have determined on its own, the diagnosis is not admissible under OEC 403." *Id.* at 142.

Defendant's reading of *Southard,* in contrast, emphasizes a distinction between an actual diagnosis of "sexual abuse," and what the court termed "subsidiary principles that inform that diagnosis." *Id.* In highlighting that distinction, defendant relies heavily on a footnote that immediately followed the court's observation that the diagnosis in *Southard* rested on the same criteria for determining credibility that jurors use daily across the state:

> "To the extent that the doctor employed criteria that went beyond a juror's common experience, defendant did not object to her explaining those criteria to the jury. Specifically, defendant did not object to the doctor's testimony regarding how a child's age and stage of development affects his or her ability to recount experiences, the kinds of words that a child the boy's age typically would use to describe a sexual experience, or the fact that the boy's delayed reporting did not necessarily mean that he had not been abused. *The jury was thus free to employ those criteria in making its own assessment of the boy's credibility. The question that this case presents is whether the doctor's ultimate conclusion of sexual abuse, standing alone, added anything helpful to the jury's deliberations.*"

*Id.* at 140 n 12 (emphasis added). As we understand defendant's position, relying on the last two sentences of the footnote, he argues that *Southard* contemplates a system in which a physician or similar medical expert may testify about the basis of the expert's diagnosis of sexual abuse, with which a lay person ordinarily would not be familiar. But he argues that, once those criteria are admitted, the diagnosis of sexual abuse itself adds nothing to the jury's deliberations and, therefore, is categorically inadmissible.[3]

---

[3] We note that defendant's reading of *Southard* assumes that a physician should be able to testify at length about the "subsidiary principles that inform" a diagnosis of sexual abuse. For example, defendant contends that "it was permissible" for the Liberty House nurse practitioner to testify about the elasticity of the anus and that penetration of the anus tends to cause defecation, but that testimony (and the physical evidence on which it was based) did not mean that the diagnosis of sexual abuse was admissible. However, in *Southard,* the court expressly declined to address whether those subsidiary principles were themselves admissible. 347 Or at 142. We think it unlikely that the proper reading of *Southard* is premised on a holding that the court specifically declined to reach.

We decline to extend *Southard*'s holding beyond cases in which a diagnosis of "sexual abuse" was made in the absence of any physical evidence of abuse. We also reiterate the narrow nature of that holding. *Southard* held only that a diagnosis of "sexual abuse" is inadmissible under OEC 403 when it is not supported by any physical evidence of abuse. In doing so, the court did not hold that the mere existence of physical evidence would cause a medical diagnosis of "sexual abuse" to become *per se* admissible. *See Vidal*, 245 Or App at 517 (noting that that question remains unanswered). The admissibility of a diagnosis in such circumstances continues to be subject to the balancing test of OEC 403.

With that in mind, we turn to defendant's second argument on appeal, that "physical evidence," as contemplated in *Southard*, refers only to physical evidence of abuse found on the complainant's body. To the extent that defendant is arguing that the physical evidence requirement in *Southard* requires more than *any* "physical evidence" that may arguably corroborate a child's allegations of abuse, we agree. But defendant provides no support for the distinction that he posits between physical evidence located on the body of a child and evidence about the physical effects of abuse on a child's body—or, for that matter, any other physical remnants of abuse. We see no reason to adopt such a restrictive interpretation. Reviewing the concerns underlying the court's holding in *Southard*, and our subsequent case law applying that holding, we hold, instead, that there is sufficient physical evidence of abuse to avoid *Southard*'s proscription—that is, there is sufficient physical evidence so that the diagnosis of sexual abuse tells the jury something that it is not equally capable of determining on its own—when (1) the significance of that physical evidence is "the sort of complex factual determination that a lay person cannot make as well as an expert," (2) the physical evidence is corroborative of the type of abuse actually alleged, and (3) the medical expert actually relies on the physical evidence in making a diagnosis of sexual abuse.

The first of those requirements is a logical outgrowth of the court's determination that the probative value of the diagnosis in *Southard* was slight. As noted, that determination was based on two observations. The first was

that the criteria employed by the physician in making her diagnosis were "essentially the same criteria that we expect juries to use every day * * * to decide whether witnesses are credible." *Southard*, 347 Or at 140. The second was that the diagnosis did not present a "complex factual determination that a lay person cannot make as well as an expert." *Id.* As the foundation for a diagnosis of sexual abuse moves away from a routine credibility determination, however, and begins to incorporate physical evidence and a medical professional's determination of the physiological significance of that evidence—as the Liberty House nurse practitioner's diagnosis did here—that diagnosis ceases to be one that a lay person can make as well as an expert, and it ceases to be based upon the same criteria that we expect juries to employ in everyday credibility determinations. Accordingly, the probative value of the diagnosis increases.

However, the mere existence of some medically significant physical evidence, however, does not, on its own, remove a diagnosis from the universe of determinations that a jury may make as well as an expert. The medical expert must also apply his or her expertise in relying on that evidence. Two of our cases are illustrative. In both *Lovern* and *Vidal*, we addressed medical diagnoses of sexual abuse where a medical professional found abnormalities in the hymens of children who had allegedly suffered sexual abuse. In both cases, the children were diagnosed with sexual abuse, and those diagnoses were admitted at trial. On appeal, both defendants argued that, under *Southard*, the diagnoses were admitted in error. We reviewed the claims for plain error, reversing in *Lovern* and affirming in *Vidal*.

In *Lovern*, a child reported that the defendant had touched her vagina, breasts, and buttocks and that he had penetrated her bottom with his penis. 234 Or App at 504. At trial, a physician testified that, during an examination, she had found "a couple of notches in part of [the child's] hymen." *Id.* at 505. She noted that that level of notching was "unusual" but "not so specific that it indicates that there was clearly an injury there before." *Id.* In reviewing the defendant's claim for plain error, we concluded that there was "no material legal distinction between the admissibility of the expert's diagnosis of sexual abuse in *Southard* and

the admission of the diagnosis in [*Lovern*]." *Id.* at 510-11. We relied on the fact that, by the physician's own testimony, "the physical evidence neither confirmed nor refuted a diagnosis of sexual abuse." *Id.* at 511. Further, we noted that, "given the nature of the charged conduct, which did not involve penetration of the complainant's vagina, the results of the physical examination did not corroborate the alleged abuse." *Id.* at 511 n 6. Because the physician had not actually relied on the physical evidence—and because the physical evidence did not corroborate the alleged abuse—we held that her diagnosis was based solely on the complainant's statements and history and, thus, reduced to a mere credibility determination. *Id.* at 512. Accordingly, we held that, under *Southard*, the admission of the physician's testimony constituted plain error. *Id.*

Similarly, in *Vidal* a child reported multiple instances of sexual abuse by the defendant, including rape. A nurse testified at trial that, during an examination, she observed "decreased hymenal tissue" and "'angularities' at several locations on the posterior of the hymen." 245 Or App at 513. She testified that those irregularities could be indicative of "a penetrative injury caused by abuse or assault[,]" but, when asked whether they could also "be a variation of normal" or "something besides abuse," she answered, "Yes." *Id.* at 514. On plain error review, however, we distinguished *Lovern* and reached the opposite conclusion about the admissibility of the nurse's diagnosis of sexual abuse. We noted that, in contrast to *Lovern*, where the physician "certainly underplayed—if not rejected outright—any significance of the appearance of the child's hymen in making [her] diagnosis of sexual abuse[,]" the nurse in *Vidal* had testified that the irregularities on the child's hymen were significant to her diagnosis. *Vidal*, 245 Or App at 517. Further, the nurse testified that the physical evidence was corroborative of a penetrative injury to the child's vagina, as had been reported. *Id.* That reliance, along with the consistency between the evidence and the reported abuse, brought the diagnosis outside of *Southard*'s holding—even though the evidence was not independently determinative. *Id.*

Thus, although the nature of the physical evidence in both cases was largely the same, we distinguished *Vidal*

from *Lovern* based on the corroborative value of—and the medical expert's actual reliance on—the physical evidence of abuse. Those differences transformed the medical expert's diagnosis from a mere credibility determination about the child's statements into something more.

Applying those factors to this case, we conclude that the fecal matter that A's mother found on her bedroom floor was precisely the type of physical evidence of abuse identified in *Southard*. The nurse practitioner testified at length about the medical significance of the fecal matter, which she described as "interesting and somewhat concerning." She explained that, because A had no history of defecating in inappropriate places, the fecal matter was "concerning that something had happened to [A's] anal area." She went on to explain the physiology of the rectal muscles, how the stimulation of those muscles can elicit a bowel movement, and, thus, that the defecation was consistent with the alleged abuse. On cross-examination, she clarified that her understanding of the physiology was based on her medical knowledge.

That physiological determination is the type of complex factual determination that a lay person cannot make as well as an expert. It required the application of specific, specialized medical knowledge to diagnostic facts. As such, it was not based on criteria that we expect juries to use every day, but on the nurse practitioner's understanding of the physiology of the rectum. Further, the fecal matter corroborated A's specific allegations of abuse. Finally, before admitting the nurse practitioner's diagnosis, the court reaffirmed that the diagnosis was based on "one, the child's statements, and, two, the fact that the child pooped on the floor." Accordingly, the nurse practitioner actually relied on the physical evidence—not merely on A's statements.

Under those circumstances, we conclude that the nurse practitioner's diagnosis of sexual abuse was not inadmissible under *Southard*.[4] Accordingly, we hold that the trial court did not err in admitting the diagnosis.

Affirmed.

---

[4] Defendant did not argue, either at trial or on appeal, that the diagnosis was nevertheless unduly prejudicial under OEC 403, and we do not address that issue here.