Argued and submitted September 17, 2008, decision of Court of Appeals reversed; judgment of circuit court reversed, and case remanded to circuit court for further proceedings October 1, 2009

## STATE OF OREGON,
*Respondent on Review,*

*v.*

## KERMIT EUGENE SOUTHARD,
*Petitioner on Review.*

(CC 04FE0347ST; CA A128253; SC S055463)

218 P3d 104

Anne Fujita Munsey, Senior Deputy Public Defender, Salem, argued the cause and filed the brief for petitioner on review. With her on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Anna M. Joyce, Assistant Attorney General, Salem, argued the cause and filed the brief for respondent on review. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

KISTLER, J.

**KISTLER, J.**

The question in this case is whether a medical diagnosis of child sexual abuse is admissible scientific evidence. The trial court ruled that it is. After considering testimony regarding that diagnosis, as well as other evidence that defendant had abused his girlfriend's two children, a jury convicted defendant of three counts of sodomy. The Court of Appeals affirmed the trial court's judgment without opinion. *State v. Southard*, 214 Or App 292, 164 P3d 351 (2007). We allowed defendant's petition for review and now reverse the Court of Appeals decision and the trial court's judgment.

Defendant moved in with his girlfriend, her five-year-old son, and her three-year-old daughter.[1] Afterwards, defendant's girlfriend (mother) was incarcerated for possessing controlled substances, and the state placed her children initially with their maternal grandmother and later with a foster mother. Both mother and the foster mother noticed that the then six-year-old boy began engaging in actions that concerned them. They reported

> "that [the boy] had been caught on several occasions with his pants pulled down and trying to get other kids to kiss his penis. Foster Mom described multiple incidents of [his] touching other kids on their bare bottoms. Additionally, [he] would frequently expose himself to adults and children in and out of the home. Mom and Foster Mom shared that [he] frequently grabs his groin area stating that his balls are sticking. Mom and Foster Mom feel this is a habit that has developed for [him]."

While visiting his maternal grandmother, the boy disclosed that defendant made him suck defendant's penis and that defendant had made the boy's younger sister do the same thing. After hearing that information, grandmother spoke with the children's mother, who in turn called the foster mother. She recommended that mother call the Department of Human Services and the police. Those

---

[1] On review, defendant challenges the trial court's pretrial ruling that a diagnosis of sexual abuse is admissible, and we take the facts from the evidence brought out at the pretrial hearing. Most of those facts are not disputed. To the extent that a dispute exists, we state the facts consistently with the trial court's ruling.

agencies referred both children to the KIDS Center, a nationally accredited medical facility in Deschutes County that examines children to determine whether they have been sexually or physically abused.

In determining whether abuse has occurred, the KIDS Center follows statewide interviewing and medical procedures as well as guidelines established by the American Professional Society on the Abuse of Children. Specifically, a team consisting of a social worker and a physician examine each child who is referred to the center. The social worker receives information from the referring agency and also takes a history from the child's parents or caregiver. After reviewing that history, the social worker conducts a videotaped interview with the child, and the physician conducts a medical examination to see if there is physical evidence of abuse.

In conducting the interview and the medical examination, the social worker and physician ask open-ended questions to avoid suggesting an answer. They also tell the child at the beginning of the interview that "it's okay to correct us, it's okay to say, 'I don't know,' it's okay to say, 'I don't remember.'" The center follows that protocol because, "[o]therwise, kids won't do that, and they'll acquiesce to possibly what the adult would suggest." The interview is videotaped and peer-reviewed to ensure that the interviewer is asking appropriate, nonsuggestive questions and also to ensure that the interviewer is not "using certain gestures or head motions that [suggest a particular] answer." Based on the child's history, the interview, and the medical examination, the social worker and the physician consult with each other, and the physician diagnoses whether sexual abuse has occurred. Another member of the KIDS Center then reviews their data and conclusion. In some cases, the center consults with other state and national organizations in making a diagnosis.

In this case, the doctor who examined the boy diagnosed him as having been sexually abused. The doctor who examined the girl was unable to diagnose whether she also had been sexually abused. In the course of reaching those conclusions, a social worker spoke with the boy's mother and foster mother, who reported the behaviors (noted above) that had concerned them. The social worker also interviewed the

boy, who told her that defendant "made [him] suck on [defendant's] private." The boy described other details about the sexual activity and said that "it would stop when his mom came home." He "described seeing [his sister] sucking on [defendant's] private and recalled that [defendant] 'peed on [his sister].' " He added that his sister "sucked on [defendant's] private 'a lot more times more than I did, because he told her to.' " The interviewer spoke with the girl, who denied that any sexual contact had occurred.

A physician then conducted medical examinations of each child, which did not reveal any physical evidence of sexual abuse. Dr. Largent, the director of the KIDS Center, later testified that the absence of physical evidence was not surprising. She explained that the type of sexual contact that the boy reported "doesn't leave any physical marks most of the time, nothing that we [can] see." The social worker and physician accordingly considered the boy's statements to them, as well as the history that they had received from the boy's mother and foster mother, in determining whether sexual abuse had occurred. In deciding whether to credit the boy's reports of abuse, they considered whether the boy had used age-appropriate terms to describe the abuse, whether he had provided specific details, and whether the events that he had described were consistent with other historical facts. They also considered whether the behaviors that the mother and foster mother had reported were consistent with the reported abuse. Having considered those factors, the physician diagnosed the boy as having been sexually abused.

The state charged defendant with two counts of sodomy regarding the boy and one count of sodomy regarding the girl. Before trial, the defendant filed a motion *in limine* to preclude the state from introducing "any diagnosis of 'sex abuse' on the groun[d] that such evidence is 'scientific evidence' under OEC 702 and must be subject to the foundational requirements for such evidence." The trial court held a pretrial hearing to resolve defendant's motion. In addition to the evidence set out above, the state offered evidence at the pretrial hearing that a diagnosis of sexual abuse is generally accepted within the medical community, that there are numerous published, peer-reviewed studies verifying the techniques that the KIDS Center uses to elicit and evaluate

the information, and that the KIDS Center follows established guidelines in evaluating the information that it receives.

After considering that evidence, the trial court ruled that the diagnosis of sexual abuse was admissible. At trial, a physician from the KIDS Center testified that, after consulting with the social worker who had interviewed the boy and the director of the KIDS Center, she had diagnosed the boy as having been sexually abused. The state also introduced other evidence that defendant had abused the children, and the jury found him guilty of three counts of first-degree sodomy (two counts regarding the boy and one count regarding the girl). The Court of Appeals affirmed the resulting judgment without opinion. We allowed defendant's petition for review to consider whether, under the circumstances presented here, a diagnosis of sexual abuse is admissible scientific evidence.

On review, both parties agree that a doctor's diagnosis of child sexual abuse is scientific evidence. Because the diagnosis "possesses the increased potential to influence the trier of fact as [a] scientific assertion[ ]," the scientific principles on which the diagnosis rests must meet a minimum level of scientific validity for the diagnosis to be admissible. *State v. Marrington*, 335 Or 555, 561, 73 P3d 911 (2003). The parties disagree, however, whether the diagnosis in this case meets that minimum level. Defendant argues that, without physical evidence of abuse, a diagnosis of child sexual abuse is too unreliable and not sufficiently verifiable to be considered scientifically valid.[2] The state responds that doctors frequently make diagnoses based solely on the history that a patient provides and that the scientific principles on which the diagnosis in this case rests are well established.

■ The parties' debate invokes familiar principles. Over the past 25 years, this court has considered, in a series of cases, when scientific evidence will be admissible in both civil and criminal proceedings. *See, e.g., Marcum v. Adventist*

---

[2] Defendant does not argue that sexual abuse is not a condition recognized within the medical community, nor does he argue that doctors do not diagnose and treat that condition. Rather, he acknowledges that, if there were physical evidence of abuse, a doctor could testify regarding his or her diagnosis of sexual abuse.

*Health System / West*, 345 Or 237, 193 P3d 1 (2008); *Jennings v. Baxter Healthcare Corp.*, 331 Or 285, 14 P3d 596 (2000); *State v. Brown*, 297 Or 404, 687 P2d 751 (1984). To be admissible, scientific evidence must meet three criteria: It must be relevant, OEC 401; it must possess sufficient indicia of scientific validity and be helpful to the jury, OEC 702; and its prejudicial effect must not outweigh its probative value, OEC 403. *Marcum*, 345 Or at 243; *Jennings*, 331 Or at 301.

Much of the focus in our cases has been on the second step in the analysis—determining when scientific evidence possesses sufficient indicia of scientific validity to be admissible under OEC 702.[3] And we think that, logically, that is the first question that we must answer in this case. If the diagnosis possesses sufficient indicia of scientific validity to be probative and thus admissible, then there can be little doubt that the diagnosis is relevant here; the state charged defendant with two counts of sodomy regarding the boy, and the diagnosis makes it more likely that the charged crimes had occurred. *See State v. Cox*, 337 Or 477, 485, 98 P3d 1103 (2004) ("Evidence is relevant if it increases or decreases, even slightly, the probability of the existence of any material fact in issue."). Similarly, we cannot determine, under OEC 403, whether the probative value of the doctor's diagnosis is substantially outweighed by the risk of unfair prejudice without first determining the validity of the diagnosis, which bears on its probative value. *See Brown*, 297 Or at 438 (following that sequence).

Accordingly, we begin with the question whether the evidence possesses sufficient scientific validity to be admissible, and we base our decision on the record that the parties developed below. In *Brown*, this court rejected the notion that general acceptance within the relevant scientific community is the sole criterion for determining whether scientific evidence is admissible. 297 Or at 416. Rather, general acceptance is only one of several factors that bear on the

---

[3] OEC 702 provides:

"If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise."

admissibility of scientific evidence. *See id.* at 417 & n 5 (listing seven primary and 11 additional factors);[4] *State v. O'Key*, 321 Or 285, 306, 899 P2d 663 (1995) (adding four factors set out in *Daubert v. Merrill Dow Pharmaceuticals*, 590 US 579, 113 S Ct 2786, 125 L Ed 2d 469 (1993)).[5]

Not all of the factors that the court identified in *Brown* and *O'Key* will necessarily apply in a given case, nor has the court required that all or even a majority of the applicable factors be satisfied for evidence to be admissible. *See Marcum*, 345 Or at 248 ("[T]he basis for establishing the scientific validity of a differential diagnosis will vary depending on the type of injury."); *Jennings*, 331 Or at 306-09 (ruling that a differential diagnosis that ruptured silicone implants caused the plaintiff's neurological disorder was admissible even though the diagnosis did not satisfy several listed factors). As with many multi-factor tests, the answers that the *Brown* analysis has produced have tended to be case specific.

In undertaking that inquiry in this case, we note that a diagnosis of child sex abuse differs from other medical diagnoses. Most medical diagnoses provide jurors with information that is beyond their common experience; the diagnoses identify the occurrence of a complex medical condition, determine its cause, or predict the future resolution of the condition. *See Marcum*, 345 Or at 245-46 (diagnosis that gadolinium exposure caused the plaintiff's vasospastic disorder); *Jennings*, 331 Or at 309-10 (diagnosis that ruptured silicone breast implants caused the plaintiff's neurological disorder). A diagnosis of child sex abuse, however, determines whether conduct (an act of sexual abuse by another person) has occurred; the conduct is not complicated, and the ability to determine its occurrence often is a matter within a lay person's competence. In this case, for example, if a lay person

---

[4] The seven primary factors listed in *Brown* are: (1) the technique's general acceptance in the field; (2) the expert's qualifications and stature; (3) the use that has been made of the technique; (4) the potential rate of error; (5) the existence of specialized literature; (6) the novelty of the invention; and (7) the extent to which the technique relies on the subjective interpretation of the expert. 297 Or at 417.

[5] The four factors listed in *O'Key* overlap, to some degree, with the seven factors set out in *Brown*. They are: (1) whether the theory or technique can and has been tested; (2) whether the theory or technique has been subject to peer review; (3) the known or potential rate of error; and (4) the degree of acceptance in the relevant scientific community. 321 Or at 303-04.

were to credit the boy's statements that defendant made him and his sister engage in oral sex, then it follows that the children were sexually abused. It also follows that the doctor's ultimate conclusion in this case—that sexual abuse had occurred—did not turn on an abstruse matter of science; rather, it turned primarily on the sort of credibility determination that lay jurors ordinarily make.[6]

In determining whether the diagnosis possesses sufficient indicia of scientific validity to be admissible, we begin by identifying the methodology that the KIDS Center used to make its diagnosis. *See Jennings*, 331 Or at 305 (explaining that, in determining whether a doctor's opinion regarding causation was admissible scientific evidence, "we focus on [the doctor's] methodology, not on his conclusions"). As noted, the KIDS Center uses a standardized three-part process to diagnose child sex abuse. First, the KIDS Center takes the child's history from the parent or caregiver, other family members, and medical documents. Second, the center conducts a videotaped interview of the child, followed by a physical exam. The primary purpose of the physical exam is to find physical signs of abuse, but the doctor continues to ask questions of the child during the exam. Finally, after completing the interviews and processing any lab results, the doctor and the social worker make a diagnosis as a team using guidelines created by the center and other national researchers.

Taking a history from family members or caregivers is neither novel nor unusual. Gathering a patient's history from those sources is a standard feature of medicine relied upon by doctors to diagnose a wide variety of conditions. To be sure, the inferences that an expert draws from that history

---

[6] We recognize that, in diagnosing sexual abuse, a doctor may draw on subsidiary principles from the medical and social sciences. In this case, for example, the doctor relied on the way that children typically express themselves to determine whether the boy had been coached or was using his own words to describe his experience. She also noted a strong correlation between the boy's reported behaviors and sexual abuse. Finally, she noted that the fact that the boy had not reported the abuse immediately did not necessarily mean that he had not been abused. Defendant did not challenge at trial the validity of those subsidiary principles; rather, he aimed his attack solely at the diagnosis itself—the doctor's ultimate conclusion that the boy had been sexually abused. We limit our discussion to the testimony that defendant challenged.

(and the principles that the expert uses to draw those inferences) may be subject to challenge. In this case, the boy's history disclosed instances of sexualized behaviors, and the doctor explained that research had shown a strong correlation between the behavior that the boy exhibited and sexual abuse.[7] Defendant, however, did not challenge at trial the research on which the doctor relied to identify that correlation, and we see nothing in the first step in the methodology that the KIDS Center used (taking a patient's history) that would cause us to question the scientific validity of its diagnosis.

The second procedure that the KIDS Center used—interviewing the patient—is also a standard component of a medical diagnosis. Interviewing a patient is often the only way for psychologists, psychiatrists, and other doctors to gather sufficient information to diagnose (and treat) a variety of conditions. Largent explained that interviewing children presents special problems, and the KIDS Center has several procedures in place to enhance the accuracy of those interviews. All the interviewers follow the Oregon Interviewing Guidelines, a statewide guideline for questioning children about abuse.[8] The guidelines that the interviewers follow are based on generally accepted techniques for interviewing children and have been the subject of extensive peer-reviewed literature.

The KIDS Center also conducts a medical examination to look for evidence that either confirms the reported abuse or provides alternative explanations for certain physical phenomena. In this case, the results of the medical examination were neutral. The examination revealed no physical evidence of abuse; however, as Largent explained, the type of abuse that the boy reported is unlikely to leave any physical evidence—a proposition that defendant also does not challenge. We conclude that, in interviewing the patient and

[7] Largent was careful to say that the behaviors that the boy exhibited (asking other children to "kiss" his penis and the like) did not necessarily establish that the boy had been sexually abused. Rather, she testified only that research showed a strong correlation between sexual abuse and those types of behaviors.

[8] The KIDS Center also uses the Oregon Medical Guidelines and a forensic analysis guide designed by the American Professional Society on the Abuse of Children.

conducting the medical examination, the KIDS Center employs valid, scientifically accepted methodologies.

Finally, the KIDS Center seeks to determine, based on the child's history, the interview, and the medical examination, whether the child has been sexually abused. Because there was no physical evidence of sexual abuse in this case, the KIDS Center based its diagnosis on (1) the boy's reported behaviors and (2) its determination that the boy's reports of sexual abuse were credible. As noted, defendant did not challenge at trial the scientific validity of the research showing a correlation between sexual abuse and the types of behaviors that the boy exhibited. And the kinds of considerations that the KIDS Center used to determine whether to credit the boy's statements are standard fare in assessing credibility. Largent explained that, in evaluating the boy's credibility, the KIDS Center considered whether the words that the boy used to describe the abuse were appropriate for a child his age, whether the reports were detailed, whether the details were consistent with other historical facts, and the circumstances under which the boy first reported the abuse. In evaluating the data that it gathered, the KIDS Center followed nationally accepted protocols for diagnosing child abuse.

Considering the totality of the procedures that the KIDS Center used and based on the record developed in this case, we conclude preliminarily that the KIDS Center's diagnosis has sufficient indicia of scientific validity to be admissible. The experts were all qualified, the techniques used are generally accepted, the procedures rely on specialized literature in the field, and the procedures used are not novel. Furthermore, the KIDS Center follows numerous safeguards to enhance objectivity and increase the accuracy of the final diagnosis.

Defendant, for his part, recognizes that a diagnosis of child sexual abuse is admissible scientific evidence when physical evidence corroborates the doctor's conclusion. He argues, however, that, without physical evidence of abuse, a diagnosis of child sexual abuse is too unreliable to be admissible. Defendant's argument proves too much. If physical evidence were a necessary prerequisite of a scientifically valid medical diagnosis, trial courts would be hard pressed to

admit any diagnosis of mental capacity, mental suffering, or even illnesses like migraines that have no visible outward manifestation. Indeed, the rule that defendant advances would preclude introducing some of the most traditional and important forms of scientific evidence in criminal trials, such as expert testimony to prove insanity. The limitation that defendant urges would impose an arbitrary restriction on the admission of expert medical testimony.

Defendant argues additionally that the lack of "falsifiability" of the studies relied upon by the doctors at the KIDS Center makes the diagnosis invalid. The thrust of defendant's argument is that, without controlled experimentation and the elimination of independent variables to verify the accuracy of results, the conclusions that the national studies have drawn are not scientifically valid. Ethical concerns, however, counsel against the sort of controlled experimentation that defendant would require as a basis for admitting a medical diagnosis of sexual abuse, *see State v. Perry*, 347 Or 110, 114 n 3, 218 P3d 95 (2009) (so stating), and the absence of this factor does not automatically make a scientific conclusion invalid. *See id.* at 124 (recognizing that proposition); *Brown*, 297 Or at 428 (holding that polygraph results were admissible under OEC 401 and OEC 702 even though their "falsifiability" could not be tested).[9] Where science cannot ethically provide such an indicator, we are required to look more closely at other factors that offset the unavailability of that indicator. *See Perry*, 347 Or at 124 (stating proposition).

After considering the methodologies that the KIDS Center used to diagnose child sexual abuse, we conclude that

---

[9] The court explained in *Brown* that the " 'accuracy of the [p]olygraph technique [cannot] be determined in a psychology laboratory setting or by the use of fictitious crimes under other testing circumstances. This limitation prevails for the simple reason that it is practically impossible to simulate conditions comparable to those involved in actual case situations.' " 297 Or at 428 (quoting John E. Reid & Fred Edward Inbau, *Truth and Deception: The Polygraph (Lie-Detector Technique)* 303-04 (2d ed 1977)). Even though the accuracy of polygraph results could not be verified, the court held that those results still possessed sufficient indicia of scientific validity to be admissible under OEC 401 and OEC 702. *Id.* at 438. The problem, as the court explained, was that the potential for jurors to overvalue the evidence outweighed its probative value, making the evidence inadmissible under OEC 403. *Id.* at 442.

the diagnosis possesses sufficient indicia of scientific validity to be admissible.[10] Put differently, we cannot say that, based on this record, a diagnosis of child sexual abuse is "bad science" that should be excluded automatically as scientifically invalid. *See O'Key*, 321 Or at 306 ("[A] trial court should exclude 'bad science' in order to control the flow of confusing, misleading, erroneous, prejudicial, or useless information to the trier of fact.").

■■ Although we agree with the trial court that the diagnosis is scientifically valid, scientific validity is not the end of the inquiry. To be admissible, the evidence also must be relevant, and its probative value must not be substantially outweighed by the danger of unfair prejudice. *Marcum*, 345 Or at 243. We turn to those issues. As noted above, the doctor's diagnosis is relevant. Whether sexual abuse has occurred is a material fact in proving a charge of sodomy, and the doctor's diagnosis that the boy had been sexually abused increased the probability of that fact's occurrence. *See Cox*, 337 Or at 485 (stating standard for relevance). The remaining question is whether, under OEC 403, the probative value of the diagnosis "is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay or needless presentation of cumulative evidence." *See Brown*, 297 Or at 438-39 (restating the terms of OEC 403).

This court faced a similar issue in *Brown*. 297 Or at 438-42. It began by explaining that, based on its assessment of the scientific validity of polygraph evidence, that evidence had "some probative value." *Id.* at 438. It then noted that, in the context of polygraph evidence, the risk of prejudice stemmed from the fact that "the trier of fact may be overly impressed or prejudiced by a perhaps misplaced aura of reliability or validity of the evidence, thereby leading the trier of fact to abdicate its role of critical assessment." *Id.* at 439. Among other things, the court noted that the tendency to give

---

[10] Indeed, the nature of the medical diagnosis in this case makes it difficult for defendant to argue that the diagnosis does not meet a minimum level of scientific validity; that is, it is difficult to understand why experienced professionals, under controlled conditions, are incapable of accurately making the same determination that we expect of a panel of lay jurors to make—namely, whether sexual abuse has occurred.

polygraph evidence undue weight could cause jurors to abdicate their traditional role of assessing the credibility of witnesses. *Id.* at 440-41, 440 n 31. Balancing that and other concerns against the probative value of polygraph evidence, the court concluded that the reasons for excluding that evidence far outweighed its probative value. *Id.* at 442.[11]

Although the calculus differs slightly between this case and *Brown*, we reach the same conclusion that the court did in *Brown*. In determining the probative value of the doctor's ultimate conclusion of sexual abuse, we note that her diagnosis did not tell the jury anything that it was not equally capable of determining on its own. As noted above, whether defendant caused the boy to engage in oral sex (and thus sexually abused him) does not present the sort of complex factual determination that a lay person cannot make as well as an expert. If the jury credited the boy's reports of oral sex (which he recounted to his grandmother, the staff at the KIDS Center, and the jury at trial), then it necessarily follows that he was sexually abused. And, while the staff at the KIDS Center are experienced professionals, the criteria that the staff used to decide whether to credit the boy's testimony are essentially the same criteria that we expect juries to use every day in courts across this state to decide whether witnesses are credible.[12] Because the doctor's diagnosis in this case did not tell the jury anything that it was not equally capable of determining, the marginal value of the diagnosis was slight.

The risk of prejudice, however, was great. The fact that the diagnosis came from a credentialed expert, surrounded with the hallmarks of the scientific method, created

---

[11] This court did not defer to the trial court in determining the admissibility of scientific evidence under OEC 403. *See Brown*, 297 Or at 442.

[12] To the extent that the doctor employed criteria that went beyond a juror's common experience, defendant did not object to her explaining those criteria to the jury. Specifically, defendant did not object to the doctor's testimony regarding how a child's age and stage of development affects his or her ability to recount experiences, the kinds of words that a child the boy's age typically would use to describe a sexual experience, or the fact that the boy's delayed reporting did not necessarily mean that he had not been abused. The jury was thus free to employ those criteria in making its own assessment of the boy's credibility. The question that this case presents is whether the doctor's ultimate conclusion of sexual abuse, standing alone, added anything helpful to the jury's deliberations.

a substantial risk that the jury "may be overly impressed or prejudiced by a perhaps misplaced aura of reliability or validity of the evidence[.]" *Brown*, 297 Or at 439. As in *Brown*, the diagnosis is particularly problematic because the diagnosis, which was based primarily on an assessment of the boy's credibility, posed the risk that the jury will not make its own credibility determination, which it is fully capable of doing, but will instead defer to the expert's implicit conclusion that the victim's reports of abuse are credible. *See id.* at 440-41 (reasoning that polygraph evidence could effectively take over the jury's traditional function of judging the credibility of witnesses). In our view, the risk of prejudice substantially outweighs the minimal probative value of the diagnosis.

Other jurisdictions have held, in a related context, that a doctor's diagnosis of sexual abuse is not helpful to the jury under FRE 702 (or those jurisdictions' counterparts to that rule) and thus is not admissible. Those courts have concluded that a medical diagnosis on the "ultimate issue of sexual abuse" does not tell the jury anything that it is not capable of determining without expert assistance. *See United States v. Whitted*, 11 F3d 782, 785 (8th Cir 1993) ("Because jurors are equally capable of considering the evidence and passing on the ultimate issue of sexual abuse * * *, a doctor's opinion that sexual abuse has in fact occurred is ordinarily neither useful to the jury nor admissible."); *United States v. Charley*, 189 F3d 1251, 1264-69 (10th Cir 1999) (following *Whitted*); *State v. Iban C.*, 275 Conn 624, 639, 881 A2d 1005 (2005) (a specific diagnosis of child sex abuse did not assist the jury because "this type of assessment was well within the jurors' capabilities and understanding and did not require a separate conclusion from [an expert] that sexual abuse had taken place"); *Atkins v. State*, 243 Ga App 489, 496-95, 533 SE2d 152 (2000) (holding that experts cannot opine that abuse did in fact occur); *State v. Batangan*, 71 Haw 552, 558, 799 P2d 48 (1990) ("[C]onclusory opinions that abuse did occur and that the child victim's report of abuse is truthful and believable is of no assistance to the jury, and therefore, should not be admitted.").

As we understand those decisions, they rest on the proposition that the degree to which the diagnosis advances the jury's ability to evaluate the evidence is minimal and that

the risk that the jury will defer to the expert's assessment outweighs whatever probative value the diagnosis may have. As Mueller and Kirkpatrick explain,

> "Where the issue and subject are ones lay jurors can appreciate and evaluate by applying common knowledge and good sense, admitting expert testimony seems the wrong thing to do and may warrant reversal if it is likely to dissuade the jury from exercising its own independent judgment or if it effectively takes over the jury's traditional function to judge the credibility of witnesses."

Christopher B. Mueller & Laird C. Kirkpatrick, 3 *Federal Evidence* § 7:9, 810-13 (3d ed 2007) (footnote omitted). In essence, those courts have balanced the probative value of the diagnosis against the risk of prejudice and held, as we do, that the diagnosis is not admissible.

Our holding today is narrow. The only question on review is whether a diagnosis of "sexual abuse"—*i.e.*, a statement from an expert that, in the expert's opinion, the child was sexually abused—is admissible in the absence of any physical evidence of abuse. We hold that where, as here, that diagnosis does not tell the jury anything that it could not have determined on its own, the diagnosis is not admissible under OEC 403. We do not consider, and our decision today does not resolve, whether any subsidiary principles that inform that diagnosis are themselves admissible. This court has recognized that, depending on the foundation and the purpose for which the testimony is offered, expert testimony regarding aspects of child sexual abuse with which a lay person ordinarily would not be familiar may be admissible. *See Perry*, 347 Or at 126 (evidence that some children who have been abused may delay disclosing abuse is admissible to disprove a claim that delay in reporting demonstrates that no abuse occurred); *State v. Middleton*, 294 Or 427, 440, 657 P2d 1215 (1983) (Roberts, J., concurring) (noting the existence of well-qualified experts and a significant body of research on intrafamilial sexual abuse and reasoning that this information is not known to the average juror and is thus admissible). Other courts have recognized that, given a proper foundation, experts may tell jurors the results of their research on abused children when those results would be helpful to the jury; however, those same courts have held that an expert's

ultimate conclusion that a child has or has not been sexually abused is not admissible. *See Charley*, 189 F3d at 1264-65 (summarizing cases).

We accordingly hold that, in these circumstances, the trial court erred in admitting the diagnosis of sexual abuse. The state has not argued that the admission of that evidence was harmless, and our review of the record confirms that the state reasonably has declined to make that argument.

The decision of the Court of Appeals is reversed. The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.