Argued and submitted June 28, reversed and remanded November 23, 2011

# STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

# VLADYSLAV VOLYNETS-VASYLCHENKO,
*Defendant-Appellant.*

Washington County Circuit Court
C080575CR; A141967

267 P3d 206

Ernest G. Lannet, Chief Deputy Defender, argued the cause for appellant. With him on the briefs was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Matthew J. Lysne, Assistant Attorney General, argued the cause for respondent. With him on the brief were John R. Kroger, Attorney General, and Mary H. Williams, Solicitor General.

Before Schuman, Presiding Judge, and Wollheim, Judge, and Nakamoto, Judge.

SCHUMAN, P. J.

**SCHUMAN, P. J.**

Defendant was convicted of various sexual offenses involving a child at a home daycare operation. On appeal, defendant advances eight assignments of error, all of which relate to the trial court's admission of the portions of a doctor's testimony in which she read the treatment recommendations of the nurse who evaluated the child at an abuse assessment center. At trial, defendant objected to the admission of the testimony on hearsay grounds; on appeal, he contends that the testimony was not only inadmissible as hearsay, but also that it violated his state constitutional right to confront witnesses against him and was inadmissible under *State v. Southard*, 347 Or 127, 218 P3d 104 (2009), where the Supreme Court held that the state could not introduce evidence of an expert's diagnosis of sexual abuse unless the evidence was corroborated by physical evidence. We conclude that, regardless of whether the treatment recommendations were hearsay, they were nonetheless inadmissible under *Southard*. We therefore reverse and remand without reaching the other issues.

The complainant, K, attended a daycare that Lidyia Lyashenko operated in her home. At various times, other adults were at the home as well, including defendant and Lyashenko's adult sons, Aleks and Sergei. In February 2008, K, who was eight at the time, reported to her mother that defendant had sexually abused her at the daycare. K's mother called the police, and an officer went to the daycare to investigate. The officer did not find defendant there, but he arrested Sergei, a registered sex offender, because he believed that Sergei was residing at the daycare despite reporting a different residence.

K was eventually taken to CARES, a child abuse assessment center. At CARES, a nurse practitioner, Patricia Riley, and a social worker, Holly Bridenbaugh, conducted an abuse assessment. Riley performed a physical evaluation of K, and after that evaluation, Bridenbaugh interviewed K while Riley observed from a separate room. During both the physical evaluation and the interview, K described multiple

instances in which defendant raped, sodomized, and otherwise sexually abused her. The physical evaluation, however, did not yield findings that were diagnostic of sexual abuse.[1]

Shortly thereafter, defendant was arrested and charged with five counts of sodomy, eight counts of sexual abuse, and three counts of rape. At trial, the state offered, as one of its witnesses, Dr. Leila Keltner, the medical director of CARES. Keltner had not participated in or observed the evaluation of K; rather, she was Riley's supervisor and had reviewed Riley's medical notes and watched a videotape of K's interview. The prosecutor explored Keltner's background, training, and experience, and explained that he was offering Keltner as a "[m]edical doctor of child abuse." Defendant stipulated that Keltner was that type of specialist. The prosecutor proceeded to question Keltner concerning her review of K's case:

"Q: As a doctor, do you ever find yourself reviewing notes of other doctors or other nurse practitioners who have conducted an assessment where there's been a concern of the child having been sexually abused?

"A. Frequently.

"* * * * *

"Q. Do you have to review all the history that's been made available to that doctor or that nurse practitioner?

"A. I do review all the information that's available. Yes.

"Q. Did you do that in this case?

"A. Yes.

"* * * * *

"Q. What were those treatment recommendations, and what page of the report are they listed on?"

At that point, defendant objected, on the ground that "[t]his is not something [Keltner] has personal knowledge of. She is just going to be reading Patricia Riley's report and

---

[1] The physical examination yielded physical findings of vulvovaginitis and erythema, nonspecific findings that, according to the evidence in the record, are not diagnostic of abuse.

what the recommendations were." The trial court overruled the objection. Keltner then listed Riley's treatment recommendations, including:

- "[T]here should be no contact. She specifically says direct or indirect with [defendant]."

- "Second one is that she should have no contact with the Lyashenko family, particularly with Sergei. She notes that he is reported to be a registered sex offender."

- "That [K] be entered into individual age appropriate therapy, and that the therapist be skilled in working with children who have been victims of abuse."

- "That [K's] mother and father would benefit from crisis intervention and long term support, and that [Riley] had referred them to the CARES NW family support team. [She] recommended that there be no further questioning or discussion about the issue of abuse with [K] or within her hearing range by parent or adults."

- "[T]hat other children in the Lyashenko home may be at risk and further evaluation should occur for those children. They can be referred to CARES if indicated. And just suggesting further investigation by DHS and law enforcement."

The prosecutor also asked Keltner about the *absence* of a particular recommendation in Riley's assessment:

"Q. In having reviewed all the medical records and the videotaped interview that's available, did you see that Patricia Riley was given information about the possible concern of computer child porn by [K's mother's former boyfriend]?

"A. Yes.

"Q. Did Patricia Riley make a recommendation that [K] was to have no contact with [the former boyfriend]?

"A. No, she did not.

"Q. Do you concur with that?

"A. Yes.

"Q. So that's not a concern for you?

"A. No."

Ultimately, the jury convicted defendant on nine counts.[2] He now appeals, arguing that the trial court's admission of the treatment recommendations was error for three reasons: (1) It was untrustworthy and therefore not subject to the hearsay exception for business records; (2) it violated his state constitutional right to confront witnesses against him; and (3) it was unduly prejudicial and should have been excluded under *Southard*.[3] The state, for its part, argues that defendant did not preserve any of those arguments in the trial court and that the error in admitting the testimony, if error at all, is not apparent on the face of the record.

We begin with defendant's *Southard* argument because it is dispositive. In that case, the Supreme Court considered whether "a diagnosis of 'sexual abuse'—*i.e.*, a statement from an expert that, in the expert's opinion, the child was sexually abused—is admissible in the absence of any physical evidence of abuse." 347 Or at 142. The court held that where "that diagnosis does not tell the jury anything that it could not have determined on its own, the diagnosis is not admissible under OEC 403." *Id.* The court reasoned that, in that circumstance, the probative value of the diagnosis is "marginal" in that juries routinely make those types of credibility determinations, but that "the risk of prejudice, however, [is] great." *Id.* at 140. The diagnosis of the child in *Southard* "was particularly problematic," the court explained,

> "because the diagnosis, which was based primarily on an assessment of the [child's] credibility, posed the risk that the jury will not make its own credibility determination, which it is fully capable of doing, but will instead defer to the expert's implicit conclusion that the victim's reports of abuse are credible."

*Id.*

Defendant acknowledges that he did not make a *Southard*-based objection to the testimony about treatment recommendations. He contends, however, that the error is

---

[2] Seven of the original 16 charges were dismissed before trial.

[3] Defendant advances eight assignments of error, some of which pertain to the admission of particular treatment recommendations. We understand each of defendant's eight assignments of error to rise or fall on these three substantive contentions, and we therefore do not discuss the assignments separately.

apparent on the face of the record and we should exercise our discretion to review it. ORAP 5.45(1). We agree.

Shortly after the Supreme Court decided *Southard*, we held that admitting a diagnosis of sexual abuse in the absence of physical evidence was plain error and that we would exercise our discretion to review it. *State v. Lovern*, 234 Or App 502, 228 P3d 688 (2010); *State v. Merrimon*, 234 Or App 515, 228 P3d 666 (2010); *State v. Clay*, 235 Or App 26, 230 P3d 72 (2010). Since that time, we have issued written opinions in dozens of cases involving unpreserved claims of error under *Southard*. We have rarely ruled against defendants and affirmed the allowance of the evidence. In *State v. Martinez-Sanchez*, 244 Or App 87, 260 P3d 599 (2011), we declined to exercise our discretion to correct any error where the testimony regarding a sexual abuse diagnosis was elicited only after the defendant, on cross-examination, opened the door to that subject. In *State v. Childs*, 243 Or App 129, 132, 259 P3d 77, *rev den*, 350 Or 573 (2011), we held that, although allowing the testimony was error, it was harmless, because the case was tried to the court, the court expressly stated that it "did not particularly rely" on the diagnosis, and the testimony about abuse was corroborated by photographs. *Accord State v. Pickett*, 246 Or App 62, 264 P3d 209 (2011) (declining to address *Southard* error that was harmless). Meanwhile, we have rejected the state's argument that we should decline to exercise our discretion even when the court, and not a jury, is the factfinder, *State v. Potts*, 242 Or App 352, 353, 255 P3d 614 (2011); that any error in admitting the evidence was harmless because the defendant's principal argument was based on an insanity defense and not that abuse did not occur, *State v. Brown*, 241 Or App 226, 232, 250 P3d 386 (2011); and that the error did not usurp the jury's factfinding function because the same jury acquitted the defendant on other charges, *State v. Wedel*, 245 Or App 12, 15, 261 P3d 52 (2011). In sum, the state faces nearly insurmountable obstacles in attempting to persuade this court that it should permit the admission of a diagnosis of sexual abuse in the absence of corroborating physical evidence.

The state does not overcome those obstacles in the present case. It advances two arguments. The first is that the treatment recommendations are not a diagnosis of sexual

abuse. Although some of the recommendations, in a different context or standing alone, could be seen as not amounting to a diagnosis, the recommendations as presented to the jury in this case clearly fall within *Southard*'s prohibition. One of the recommendations was that K "be entered into individual age appropriate therapy, and that the therapist be skilled in working with children who have been victims of abuse." No juror could take that recommendation as anything other than a statement that K has been the victim of abuse. The recommendation conveyed " 'the expert's implicit conclusion that the [alleged] victim's reports of abuse are credible.' " *Merrimon*, 234 Or App at 521 (quoting *Southard*, 347 Or at 141) (brackets in *Merrimon*). That recommendation colors the others, transforming what might otherwise have been noncommittal or ambiguous recommendations (K's parents should have crisis intervention; K should not be questioned about abuse) into recommendations that supplement a diagnosis of abuse.

The state's second argument is that this case differs from *Southard* in that here, defendant's theory was not that K lied about being abused, but that she identified the wrong person as the abuser. We considered and rejected a similar argument in *Brown*, 241 Or App at 231-32. In that case, the state argued that admitting the diagnosis of sexual abuse was harmless because the fact that the victim was abused was "effectively undisputed"; the defendant's primary argument was that he was insane and the act was committed by his "alternate personality." *Id.* We disagreed:

> "[T]hat issue was not undisputed. Defendant did not admit that he engaged in the alleged criminal conduct. Although the state is correct that defendant raised a guilty but insane defense in this case, the state was not relieved of its burden to prove the elements of the crime beyond a reasonable doubt. For that reason, [the expert's] diagnosis of sexual abuse went 'directly to the heart of [the state's] factual theory of the case.' "

*Id.* at 231 (quoting *State v. Davis*, 336 Or 19, 34, 77 P3d 1111 (2003)). The same reasoning applies here. Although defendant did argue that some other person might have committed the abuse—K's mother's ex-boyfriend, whom she had evicted

for looking at child pornography, or Sergei, the son of the day-care owner—he did not concede that the abuse actually occurred. In opening argument, for example, he asserted to the jury, Maybe she made [the allegations] up. I think it's more likely that or possible for you to consider that either someone very close to [her] actually committed these crimes." This dual focus on whether the abuse actually occurred and, if so, who perpetrated it, permeated defendant's case. In that respect, it is indistinguishable from *Brown.*

We therefore conclude that admitting the doctor's testimony regarding the treatment recommendations was plain error and that the error was not harmless. For the reasons expressed in *Merrimon* and *Lovern,* we exercise our discretion to reach that error.

Reversed and remanded.