HADLOCK, J.
*65 Petitioner was convicted of sexually abusing a young girl and of invading the personal privacy of her teenaged sister. After his convictions were affirmed on direct appeal, petitioner sought post-conviction relief, alleging that he had been denied constitutionally adequate assistance of counsel both at trial and on appeal because his lawyers had not challenged the admission of certain testimony on the ground that it was inadmissible "vouching" evidence. The post-conviction court denied relief on those claims. On appeal from the judgment denying post-conviction relief, we affirm.
As explained in more detail below, we write to address only a limited number of the issues that petitioner raises on appeal. We therefore do not comprehensively describe the events that led to petitioner's convictions and to the denial of his petition for post-conviction relief. Instead, we summarize only those facts pertinent to the issues that we address in this opinion; we do so in a manner consistent with the post-conviction court's implicit and explicit factual determinations.
Petitioner lived with his girlfriend, Goings, and her two daughters, 16-year-old M and 7-year-old S. Goings and the girls' father were divorced. In early February 2010, M told her grandmother and her father's girlfriend, Foster, that petitioner had been touching her breasts. Foster alerted police the following day and an investigation ensued. A detective, McCuistion, interviewed M, S, and their *414 mother at the family's home after petitioner had been taken to a police station. M was very upset and said she "couldn't believe that they had * * * told the police." M repeatedly expressed worry about how angry her mother would be at her; she also said "that they had just kind of exaggerated it and thought the worst and * * * she just didn't want to be taken away from her mom." However, M also reported having been abused by petitioner, telling McCuistion that petitioner had intentionally touched her on the vagina when she was in the eighth grade. M also reported that she had seen adult pornography on petitioner's computer. *66 McCuistion also questioned S, who did not disclose any abuse at that point. When McCuistion asked S whether a big person had ever touched her private areas, she looked at McCuistion for 25 to 30 seconds, with tears welling up in her eyes, then said that her dog is white.
When McCuistion told Goings that M had confirmed some of the reported abuse, Goings did not exhibit any emotion or make any statements indicating concern. However, the Department of Human Services (DHS) planned at that point that the children could remain with their mother, who "was going to be protective of the children."
Soon thereafter, M was evaluated at Juliet's House, which was described as a "local child advocacy and abuse center for children, where they provide medical and physical examinations and also forensic child interviews." M was interviewed by a counselor, Warner; she also was evaluated by a physician, Sandberg, who did not discover any significant abnormalities during M's physical examination. During the Juliet's House evaluation, M stated that petitioner had sexually abused her on three occasions "with his hand to the genital area," both above and beneath her clothing. M also talked about Goings, saying that "her mom would become suicidal" if M and S were removed from her care. "[O]ver and over again," M expressed concern that she was going to be taken away from her mother, who M did not think could survive without her children. M told Warner that she had "regularly" asked S if petitioner had ever touched her, but S had always said no. M also said that she was afraid that S "was going to say something that would get herself in trouble and their mom, and that the kids would end up being taken away."
As a result of his medical examination of M, Sandberg made treatment recommendations that included no contact with petitioner, child counseling, and family counseling because "there seemed to be a lot of emotional turmoil in the family and it seemed like they needed some help and support through this."
Around this time, a DHS caseworker, Dunfee, formulated a safety plan that involved leaving the children in their mother's care because mother then "appeared to *67 believe her daughters and wanted to be protective of her daughters."
S was evaluated at Juliet's House about a week later; that evaluation included both an interview by Warner and a physical examination by Sandberg. Sandberg did not discover anything unusual during S's physical examination. During her interview, S said that, after the police left the house after their initial visit, M and Goings had argued, "yelling back and forth, 'It's your fault,' 'No. It's your fault,' while they were shaking their fists" at each other (S called the argument a "fist fight," possibly because of the shaken fists). The argument related to M having made the statements to Foster that Foster then reported to police.
When the Juliet's House evaluators asked S about touching, she responded by saying something like, "I can't talk about that, because there are some things at home that other big people don't need to know about." She did not disclose abuse at that time. She did, however, describe pornography that she had heard, while petitioner was viewing it on the computer, and said that it was inappropriate. Sandberg recommended that S have no contact with petitioner and that she participate in counseling.
Following her interview of S, Warner met with others, including DHS caseworker Dunfee. Warner testified at trial about concerns that were expressed during that meeting:
"hearing the description of the fist fight and all the chaos that had been in the family, it certainly seemed to us as though *415 [S] might have lots of reasons for not wanting to make things any worse. She felt like she was kind of guarded about what she said."
Dunfee also testified that she became concerned based on the statements that S made during her evaluation "and the way she said them that she was coached in what she had said." Based on those concerns, DHS petitioned for legal custody of the children, removed them from mother's care, and placed them with their father and Foster.
Several weeks later, S was evaluated at Juliet's House again because S had been "playing with herself" in the bathtub and told Foster that petitioner "washes in *68 between her legs and told her to wash" and "showed [her] how to play." S also said that petitioner touched her breasts. She told Foster that she had promised petitioner that she would not tell anybody about "him touching her girls and her cha cha," which is what she called her breasts and her vaginal area.
Siepmann, a therapist and forensic interviewer who works at Juliet's House, participated in S's second evaluation, as did a nurse practitioner, Montesano. Because this was S's second evaluation, Siepmann and Montesano reviewed reports from the first evaluation to learn about the previous interview, "to kind of take a look at family dynamics, anything that we should be aware of in going into our assessment of [S] that day." Siepmann explained that she and Montesano obtained personal and medical history about S before the examination "for the purpose of treatment planning." They obtain that kind of information to assess risk factors, sources of sexual knowledge, and "anything that-that might pop up that we need to be concerned about for this particular child." When a child is interviewed and discloses abuse, Siepmann makes recommendations for the child's safety. In making those recommendations, she explained, it is "important to know * * * who the child is identifying as the abuser in terms of making sure that the child is no longer having contact with that person."
During her second evaluation at Juliet's House, S told nurse practitioner Montesano that petitioner had touched her on her vaginal area, her "boobs," and her bottom. She reported that, after petitioner "played with [her] cha cha" using his fingers, it "got red and hurt when [she] went potty." As part of her treatment recommendations, Montesano recommended that S have no contact with petitioner; she testified that "[i]t was a safety issue."
Petitioner subsequently was charged with three counts of first-degree sexual abuse and four counts of invasion of personal privacy against M and two counts of first-degree sexual abuse against S.[1] A pretrial hearing was held *69 in November 2010, more than a year after the Supreme Court issued its opinion in State v. Southard , 347 Or. 127, 218 P.3d 104 (2009) (holding that evidence of an expert's diagnosis of child sexual abuse is inadmissible under OEC 403 in the absence of physical evidence of abuse), and a few months after the court issued State v. Lupoli , 348 Or. 346, 234 P.3d 117 (2010) (holding that evidence about a diagnosis of child sexual abuse impermissibly vouched for the child's credibility in the absence of physical evidence of abuse). Presumably in reliance on those decisions, petitioner's lawyer had moved to exclude evidence that Juliet's House personnel had diagnosed the children as having been sexually abused. At the hearing, the prosecutor did not oppose the defense motion; to the contrary, she stated that she did not intend "to introduce diagnosis of child sexual abuse." The prosecutor also said that she did not intend "to have the Juliet's House witnesses vouch for the credibility of the children in this case." After further discussion about other motions, the court said that two defense motions related to "the diagnosis" and "an opinion regarding credibility" were essentially moot, presumably because the prosecutor had agreed not to elicit testimony on those topics.
Petitioner's case was tried to a jury in late 2010. Both M and S testified and described having been sexually abused by petitioner. M described three times that petitioner had touched her on or near her vagina. M also *416 testified that petitioner had touched her breasts once or twice. In addition, M said, petitioner more recently had repeatedly looked at her when she was naked, when she was in the bathroom or changing clothes in her bedroom. S described petitioner having repeatedly touched her vaginal area and her breasts; she also testified about petitioner teaching her to "play[ ] with [her] cha cha." Other witnesses gave testimony describing the events outlined above.
In closing, the state emphasized the statements that the children had made to various people before trial, including during their evaluations at Juliet's House, and in their trial testimony. Petitioner's lawyer sought to persuade the jury that the children's reports of abuse should not be credited. With respect to M, petitioner's lawyer pointed to evidence that she disliked petitioner, that the family's situation *70 was not good, that she "was angry because she thought [petitioner] was taking away her mom," and that, once M told Foster that petitioner had touched her, she had "started something that couldn't be stopped," given Foster's report to police and the law enforcement response. Petitioner's lawyer also pointed to inconsistencies in M's statements over time.
With respect to S, petitioner's lawyer asserted that, "[i]f ever there was a case of obvious coaching, this was it," describing how S had testified "without any prompting" that petitioner "touched my cha cha on the outside and the inside, and my-my girls" and "repeated that a couple times, almost in a monotone." Petitioner's lawyer also emphasized how S had repeatedly been asked-before she disclosed abuse-whether petitioner had been touching her, and that S also had been told that petitioner had inappropriately touched M. Defense counsel noted that S had denied abuse at her first Juliet's House evaluation and argued that her later disclosure was a result of the frequent discussions of, and questioning about, possible abuse: "It must have become all the more obvious to this young mind that she was supposed to talk about some inappropriate touching." The lawyer also pointed out inconsistencies in S's statements and evidence that S had seen or heard pornography in the home that could have influenced the child's statements.
The jury acquitted petitioner of the sexual-abuse charges involving M but found him guilty of the "invasion of personal privacy" crimes committed against her. The jury also found defendant guilty of the two counts of first-degree sexual abuse involving S. The trial court imposed a sentence that included terms of incarceration and post-prison supervision. On direct appeal, petitioner did not assign error to any rulings that the trial court made before or during trial, except to argue that the court erred in giving a nonunanimous jury instruction-a claim that we rejected. State v. Sartin , 248 Or. App. 748, 749, 274 P.3d 259 (2012). Petitioner did, however, successfully challenge the duration of his post-prison supervision term, which led to a remand for resentencing. Id.
Petitioner subsequently filed a petition for post-conviction relief alleging that he received constitutionally *71 inadequate assistance from both his trial lawyer and his lawyer on direct appeal. As pertinent here, petitioner alleged that his trial counsel "failed to object, move to strike, move for a mistrial, and request a curative instruction after several instances of vouching[.]" Petitioner also alleged that his appellate lawyer should have sought to file a supplemental brief after the decision issued in State v. Volynets-Vasylchenko , 246 Or. App. 632, 636, 267 P.3d 206 (2011), in which we held that a trial court plainly erred by admitting evidence that a nurse practitioner who evaluated a child had made treatment recommendations including that the child receive therapy from a therapist "skilled in working with children who have been victims of abuse." According to petitioner, his appellate lawyer should have argued that, under Volynets-Vasylchenko , the trial court had plainly erred by admitting testimony from Sandberg and Montesano that they had recommended that M and S have no contact with petitioner. The post-conviction court denied each of petitioner's claims.
On appeal, petitioner first assigns error to the post-conviction court's denial of his claim for inadequate assistance of trial counsel under both the state and federal *417 constitutions.[2] "To be entitled to post-conviction relief based on inadequate assistance of counsel, a petitioner must show that counsel failed to exercise reasonable professional skill and judgment, and that the petitioner suffered prejudice as a result of counsel's inadequacy." Johnson v. Premo , 361 Or. 688, 699, 399 P.3d 431 (2017). In the post-conviction context, a petitioner demonstrates prejudice by showing "that counsel's failure had a tendency to affect the result of his trial." Id. (internal quotation marks omitted).
An attorney's performance is measured by an objective standard of reasonableness. Id. at 700, 399 P.3d 431. In evaluating that performance, "we view the conduct in question without *72 the distorting effect of hindsight," seeking to avoid any tendency "to scrutinize counsel's decisions in an overly critical light." Id . (internal quotation marks omitted). We similarly strive to avoid being influenced by hindsight in evaluating whether the petitioner was prejudiced by any deficiencies in counsel's representation; thus, we must avoid any bias toward viewing "counsel's errors as having had no effect on what may seem to have been an inevitable or foreordained outcome." Id. (internal quotation marks omitted).
In conjunction with his first assignment of error, petitioner contends that his lawyer should have objected to several statements by witnesses and the prosecutor on the ground that those statements impermissibly vouched for M or S. We reject all of those contentions without discussion, except as discussed below, where we address petitioner's arguments regarding certain testimony given by Sandberg, Montesano, and DHS caseworker Dunfee. We also reject without discussion petitioner's argument that his lawyer should have objected under Southard to the admission of "the counseling records of both M and S."
With respect to Dunfee, petitioner asserts that the caseworker "testified as to concerns that S had been 'coached' to say no abuse had occurred." Petitioner contends that Dunfee's testimony on that point was inadmissible under State v. Keller , 315 Or. 273, 844 P.2d 195 (1993), in which the Supreme Court held that a doctor impermissibly commented on a witness's testimony when he testified that "[t]here was no evidence of leading or coaching or fantasizing." Id. at 285, 844 P.2d 195. Accordingly, petitioner argues, his trial lawyer should have objected to Dunfee's testimony.
Petitioner's argument on appeal presents no basis for reversal for at least two reasons. First, petitioner fails to acknowledge that his trial lawyer did object to the testimony at issue. Specifically, petitioner's lawyer objected to Dunfee's testimony that she had become concerned, based on S's statements during her February 2010 evaluation at Juliet's House "and the way [S] said them that she was coached in what she had said." Petitioner's lawyer argued to the trial court that S had "denied abuse" at the February evaluation and argued that Dunfee's testimony about coaching concerns amounted *73 to "commenting on [S's] credibility," which was "not a proper subject of testimony." Petitioner does not explain what more his lawyer should have done in the exercise of reasonable professional skill and judgment. Second, petitioner's argument does not acknowledge the trial court's explanation that it admitted Dunfee's testimony regarding her opinion that S had been coached only for "a very limited purpose," apparently to provide context about why DHS had removed the children from their mother's care. Petitioner does not explain what objection his lawyer should have raised-or what other action his lawyer should have taken-after the court explained the limited purpose for which it admitted Dunfee's testimony. For those reasons, we reject petitioner's inadequate-assistance argument to the extent it is premised on a contention that his lawyer should have *418 objected when Dunfee mentioned the possibility of coaching.
Petitioner's final argument regarding his trial lawyer's performance relates to statements by Sandberg and Montesano that their treatment recommendations for the children included having no contact with petitioner. Petitioner argues that his lawyer should have objected to the testimony either as an impermissible comment on the children's credibility or, under Southard , as unduly prejudicial under OEC 403. Petitioner relies heavily on Volynets-Vasylchenko , in which we held that a trial court plainly erred in a case involving allegations of child sexual abuse at an in-home daycare facility by admitting evidence that a nurse practitioner who evaluated the complainant child made the following treatment recommendations:
• that the child have no direct or indirect contact with the defendant;
• that the child have no contact with certain other people associated with the daycare facility;
• that the child "be entered into individual age appropriate therapy, and that the therapist be skilled in working with children who have been victims of abuse";
• that the child's parents would benefit from support; also, that the parents not discuss the issue of abuse with the child; and *74 • that other children in the home where the daycare was located might be at risk and should be evaluated.
246 Or. App. at 636, 267 P.3d 206.
Our analysis in Volynets-Vasylchenko focused on the third of those recommendations-that the child have therapy with a therapist "skilled in working with children who have been victims of abuse." Id. at 639, 267 P.3d 206. We explained that "[n]o juror could take that recommendation as anything other than a statement that [the child] has been the victim of abuse." Id. It followed, in our view, that evidence of the nurse practitioner's recommendation conveyed to the jury her implicit conclusion that the child's reports of abuse were credible. Id. Accordingly, we held that admitting evidence of those recommendations was plain error that, not being harmless, required reversal. Id. at 639-40, 267 P.3d 206.
In petitioner's view, the treatment recommendations in this case similarly conveyed Sandberg's and Montesano's conclusions that the reports of abuse by S and M were credible. Petitioner acknowledges that the opinion in Volynets-Vasylchenko had not issued at the time of his criminal trial, but he argues that that decision was "a straight-forward application of Southard " and indicates that, had his lawyer objected to evidence of the treatment recommendations, either that evidence would have been excluded or its admission would have led to a reversal on appeal.
We do not agree that every trial lawyer exercising reasonable professional skill and judgment in late 2010 would have objected to the treatment-recommendation testimony that was admitted in this case on the ground that it constituted impermissible vouching. See Maney v. Angelozzi , 285 Or. App. 596, 397 P.3d 567 (2017) (articulating the inadequate-assistance test as asking whether, "given the trial court's actions and the arguments available to counsel under the circumstances, * * * every attorney exercising reasonable professional skill and judgment" would have made a particular argument). Before Southard and Lupoli were decided, this kind of treatment recommendation would not have been inadmissible because, under then-existing law, only direct comments on credibility were inadmissible. See *75 Logan v. State of Oregon , 259 Or. App. 319, 326 n. 5, 328 n. 6, 330-31, 313 P.3d 1128 (2013), rev. den. , 355 Or. 142, 326 P.3d 1207 (2014) (before Southard and Lupoli , lawyer did not give constitutionally inadequate assistance in child sexual abuse case by not objecting to evidence that people who evaluated the victim recommended that the child have no direct contact with the petitioner, that the petitioner have a sex-offender evaluation, and that the safety of another child who had ongoing contact with the petitioner be evaluated).
Southard and Lupoli -both decided before petitioner's trial-did significantly change the law, holding that not only direct comments on credibility are inadmissible, but *419 also diagnoses of child sexual abuse that "necessarily [are] based on [an] assessment of the child's believability." Lupoli , 348 Or. at 362, 234 P.3d 117. By the time of petitioner's trial, we had repeatedly held that definitive and provisional diagnoses of child sexual abuse were plainly inadmissible under Southard and Lupoli in the absence of physical evidence of abuse. See , e.g. , State v. Pang , 238 Or. App. 754, 755, 243 P.3d 135 (2010), rev. den. , 350 Or. 423, 256 P.3d 1097 (2011) (admission of "a diagnosis of child sexual abuse" and "a provisional diagnosis of child sexual abuse" was plain error in the absence of physical evidence); see also, e.g. , State v. Miller , 238 Or. App. 338, 339, 242 P.3d 689 (2010) (similar); State v. Arriaza , 236 Or. App. 456, 457-58, 237 P.3d 222 (2010) (similar).
In accordance with those holdings, petitioner's trial lawyer successfully worked to exclude such diagnoses from the record in petitioner's criminal trial. Petitioner nonetheless argues that his lawyer should have done more, by seeking to also exclude evidence of Sandberg's and Montesano's "no contact" treatment recommendations. Petitioner has not pointed to any appellate opinion issued before his late-2010 trial-and we are not aware of any-taking the Southard and Lupoli principles nearly as far as he argues his trial attorney should have taken them. Nothing about the treatment recommendations in this case suggests that anyone at Juliet's House had diagnosed S or M as having been abused, and no opinion issued by the time of petitioner's trial would have suggested to every lawyer exercising reasonable professional skill and judgment that "no contact" treatment recommendations were inadmissible because they, like *76 inadmissible diagnoses, "necessarily" were based on an assessment of the children's credibility. Lupoli , 348 Or. at 362, 234 P.3d 117 (explaining why sexual-abuse diagnoses are inadmissible in the absence of physical evidence). That is especially true in this case, given Siepmann's testimony suggesting that, when any child discloses abuse in a Juliet's House evaluation, Siepmann seeks to learn "who the child is identifying as the abuser" to ensure that "the child is no longer having contact with that person." One can conceive of many possible reasons to implement such a policy even before a determination has been made regarding whether the identified person in fact abused the child, including maintaining the investigation's integrity and protecting the child from further abuse if abuse has occurred. Particularly in light of that testimony, we are not persuaded that every lawyer exercising reasonable professional skill and judgment would have perceived the testimony about the "no contact" treatment recommendations in this case to necessarily be based on abuse diagnoses, to vouch for M's or S's credibility, and to therefore be objectionable.
Our opinion in Volynets-Vasylchenko does not change that analysis. The treatment recommendations on which we focused in that case more expressly related to an underlying diagnosis of abuse, specifically urging that the victim receive therapy with a therapist skilled in working with abuse victims. 246 Or. App. at 636, 267 P.3d 206. Neither Sandberg nor Montesano testified about that kind of recommendation, instead confining their testimony to the existence of "no contact" recommendations of a sort that Siepmann had suggested she made in every case in which a child identified a purported abuser. Our holding in Volynets-Vasylchenko that far more suggestive treatment recommendations amounted to impermissible comments on credibility does not establish that every lawyer exercising reasonable professional skill and judgment in 2010, before our decision in that case, would have concluded that the treatment recommendations in this case were inadmissible. Cf. Johnson , 361 Or. at 700, 399 P.3d 431 (cautioning against "the distorting effect of hindsight," which can lead courts "to scrutinize counsel's decisions in an overly critical light"). For all of those reasons, we reject petitioner's argument that the post-conviction court erred by denying *77 his claim for relief insofar as it was premised on petitioner's contention that his lawyer should have objected to evidence of the "no contact" recommendations.
Petitioner's final argument on appeal is that he received inadequate assistance of appellate counsel because, after Volynets-Vasylchenko issued, his appellate lawyer did *420 not seek to file a supplemental brief raising a new, unpreserved argument that the trial court plainly erred by admitting Sandberg's and Montesano's testimony about the "no contact" treatment recommendations. To prevail on a claim of inadequate assistance of appellate counsel, a petitioner must demonstrate "(1) that a competent appellate counsel would have asserted the claim, and (2) that had the claim of error been raised, it is more probable than not that the result would have been different." Harbert v. Franke , 284 Or. App. 374, 378, 393 P.3d 243, rev. den. , 361 Or. 800, 400 P.3d 324 (2017) (internal quotation marks omitted). We have observed that the hurdle for a post-conviction petitioner is high when, as here, the petitioner claims that his or her appellate lawyer should have raised an unpreserved argument. Except in extraordinary circumstances, "such as when the error is apparent on the face of the record, appellate counsel's failure to raise unpreserved matters does not, and cannot, constitute inadequate assistance." Id . (internal quotation marks omitted).
Keeping those principles in mind, we consider what petitioner would have had to prove to prevail on his claim of inadequate assistance of appellate counsel in this case. To prove the "inadequate performance" element of his claim, petitioner would have had to establish that any appellate lawyer exercising reasonable skill and judgment would have (1) recognized the opportunity for a new argument on appeal in light of Volynets-Vasylchenko , (2) decided that the argument was worth raising despite the fact that it was unpreserved and would require an extension of Volynets-Vasylchenko 's holding to different facts, and (3) sought to raise the argument by way of supplemental briefing because his opening brief on appeal had already been filed. And to prove prejudice, petitioner would have had to establish that it is "more probable than not" that (1) this court would have granted him leave to file the supplemental brief and that *78 (2) had we done so, we would have exercised our discretion to reverse his convictions on the ground that the trial court plainly erred by admitting the evidence of the "no contact" treatment recommendations.
We conclude that petitioner did not establish that he was prejudiced by his appellate lawyer not having sought leave to file a supplemental brief raising an unpreserved Volynets-Vasylchenko argument. Even assuming, for the sake of argument, that it is likely that we would have granted a motion for leave to file that kind of supplemental brief, we are not persuaded that petitioner established that it is more likely than not that we would have reversed his convictions on the basis of the unpreserved argument.
We are unpersuaded in that regard because petitioner has not established that-even after Volynets-Vasylchenko -we probably would have concluded in his direct appeal that the trial court plainly erred in admitting the "no contact" treatment recommendations in his case. To establish, through an unpreserved argument, that a trial court plainly erred, an appellant must establish that (1) the asserted error is one of law, (2) the error is "obvious, not reasonably in dispute," and (3) the error "appears on the face of the record," so that we "need not go outside the record to identify the error or choose between competing inferences, and the facts constituting the error are irrefutable." State v. Reyes-Camarena , 330 Or. 431, 435, 7 P.3d 522 (2000) (internal quotation marks omitted).
Any "plain error" argument based on the treatment recommendation in this case would have foundered on the second prong of that test. As noted, the problematic treatment recommendations in Volynets-Vasylchenko were significantly different than those in this case; the evaluating practitioner in Volynets-Vasylchenko had recommended that the victim receive therapy from a therapist "skilled in working with children who have been victims of abuse." 246 Or. App. at 636, 267 P.3d 206. No analogous treatment recommendations came into evidence in petitioner's criminal trial. And the "no contact" recommendations about which Sandberg and Montesano testified did not embody the same sort of direct implication of child abuse. That is, the "no contact"
*79 recommendations in this case did not necessarily convey that S and M had been diagnosed as victims of abuse, even though Montesano stated that the "no contact"
*421 recommendation was "a safety issue," particularly given Siepmann's testimony that she always makes that recommendation when a child reports abuse and identifies the purported abuser. Thus, Volynets-Vasylchenko is not directly on point, and it would not have been "obvious" that the trial court erred by admitting evidence of the "no contact" recommendations in this case.[3] Accordingly, the post-conviction court did not err by rejecting petitioner's claim that he was entitled to post-conviction relief because he received inadequate assistance of counsel when his appellate lawyer did not seek to file a supplemental brief raising an unpreserved Volynets-Vasylchenko argument.
Affirmed.

The state also charged petitioner with two counts of second-degree sexual abuse and one count of third-degree rape against M; however, the state dismissed those charges before trial.

Petitioner brought his post-conviction claims under both Article I, section 11, of the Oregon Constitution, and the Sixth and Fourteenth Amendments to the United States Constitution. Although those constitutional provisions are worded differently, the Supreme Court has explained that they are functionally equivalent. Montez v. Czerniak , 355 Or. 1, 6-7, 322 P.3d 487, adh'd to as modified on recons , 355 Or. 598, 330 P.3d 595 (2014). We accordingly do not differentiate between petitioner's state and federal claims in this opinion.

Moreover, even if petitioner had established that we likely would have concluded that an unpreserved Volynets-Vasylchenko argument established plain error, petitioner has not shown that we probably would have exercised our discretion to reverse his convictions on the basis of that unpreserved argument, given that the recommendations in this case did not amount to evidence of sexual-abuse diagnoses the way that the Volynets-Vasylchenko recommendations did.