HADLOCK, P. J.
*15 Defendant appeals a judgment of conviction for three counts of first-degree sexual abuse.[1] ORS 163.427. In his single assignment of error on appeal, defendant contends that the trial court plainly erred when it admitted a police officer's testimony that the victim, A, had received a diagnosis of "highly concerning for sexual abuse." See ORAP 5.45(1).[2] In defendant's view, in light of the Supreme Court's decision in State v. Southard , 347 Or. 127, 218 P.3d 104 (2009) (holding that evidence of an expert's diagnosis of child sexual abuse is inadmissible under OEC 403 in the absence of physical evidence of abuse), the court had an obligation to sua sponte strike that testimony. As explained below, we agree with defendant that the trial court plainly erred in admitting that evidence and that it is appropriate to exercise our discretion to correct that error. See Ailes v. Portland Meadows, Inc. , 312 Or. 376, 382, 823 P.2d 956 (1991). Accordingly, we reverse and remand defendant's convictions for first-degree sexual abuse.
The charges in this case arose as a result of disclosures of sexual abuse that A, a seven-year-old girl, initially made to her mother, M. Defendant and M had been involved in a romantic relationship on and off for several years and had one child together. Several months after M had given birth to that child, and when she and defendant were no longer in a relationship, A informed M that defendant had "raped" her. A later told M that defendant touched and smelled "her parts." M, who was a Spanish speaker, reported the disclosure to the police with the help of an English-speaking neighbor in October 2015. A deputy sheriff, Rejaian, responded to the call. Because her office does not interview children A's age who are alleged to be victims of child abuse, Rejaian referred the case to Liberty House, a child abuse assessment center, so that A could be inter-viewed there.
*284 Rejaian received a report from Liberty House *16 on November 16, 2015, and she arrested defendant a week later. Defendant was ultimately charged with, among other things, several counts of first-degree sexual abuse.
At trial, A testified that defendant had inappropriately touched her on several occasions. Perez, a forensic interviewer from Liberty House also testified about her interview of A. She described her education and experience, the interview process, and the disclosures A made during the interview. Perez also explained that a medical provider watches the interviews and conducts a physical examination of the child; that examination consists of a "head-to-toe checkup, including private parts."
During the interview, A told Perez that defendant had "smelled her where he wasn't supposed to," that another time he touched her inappropriately, and that, on another occasion, defendant had licked her private part over her clothing. Given the type of contact A described, Perez testified that she would not expect a physical examination to result in any physical evidence of the touching and, indeed, the examination of A conducted by the medical provider did not reveal any physical evidence of sexual abuse.
At trial, defendant testified that he had broken up with M a short time before A disclosed the abuse. According to defendant, M was upset and threatened him. He denied ever having inappropriately touched A.
Rejaian also testified at trial, and it is her testimony that is the subject of defendant's assignment of error on appeal. Among other things, Rejaian testified about referring A to Liberty House for an interview. She described Liberty House as being "specially trained in interviewing children" and further testified as follows:
"[The State]: And was that interview scheduled and attended by [A]?
"[Rejaian]: Yes.
"[The State]: And what was your next step?
"[Rejaian]: I received the report back from Liberty House on November 16 of 201[5], and in that report they said there was a diagnosis of highly concerning for child sexual *17 abuse. So after that, I went and contacted [defendant] at a home in Woodburn."
Defendant did not object to Rejaian's testimony regarding the diagnosis contained in the report from Liberty House.
On appeal, defendant asserts that, in the absence of physical evidence of abuse, the trial court's admission of Rejaian's testimony that A had received a diagnosis of highly concerning for child sexual abuse constituted plain error. Since Southard was decided, we have repeatedly held that the admission of a diagnosis of sexual abuse in the absence of physical evidence is plain error. See, e.g. , State v. Lopez-Cruz , 256 Or. App. 32, 37, 299 P.3d 569 (2013) (admission of a diagnosis of "abusive contact of an adult with a patient, no penetration or genital contact," in the absence of physical evidence, constituted plain error warranting reversal); State v. Volynets-Vasylchenko , 246 Or. App. 632, 639, 267 P.3d 206 (2011) (trial court plainly erred by admitting evidence that a nurse practitioner who evaluated a child had made treatment recommendations including that the child receive therapy from a therapist "skilled in working with children who have been victims of abuse"); State v. Lovern , 234 Or. App. 502, 508-12, 228 P.3d 688 (2010) (it is plain error to admit a diagnosis of child sexual abuse in the absence of physical evidence). And we have so held even in circumstances where the diagnosis was not definitive, but was phrased in terms of being "concerning" or "highly concerning" for sexual abuse. See, e.g. , State v. Feller , 247 Or. App. 416, 418, 269 P.3d 110 (2011) (trial court plainly erred in admitting physician's diagnosis of "concerning" for sexual abuse); State v. Merrimon , 234 Or. App. 515, 517, 228 P.3d 666 (2010) (trial court committed plain error in admitting, in the absence of physical evidence, a diagnosis of "highly concerning of sexual abuse"). As we explained in Merrimon , like "the definitive diagnosis at issue in Southard -indeed, perhaps more so-a diagnosis of 'highly concerning of sexual abuse' without confirming physical evidence has marginal probative value." 234 Or. App. at 520-21, 228 P.3d 666. Furthermore, *285 "such a diagnosis carries with it 'the expert's implicit conclusion that the [alleged] victim's reports of abuse are credible.' " Id. at 521, 228 P.3d 666 (quoting Southard , 347 Or. at 141, 218 P.3d 104 (brackets in Merrimon ) ). *18 The state, however, asserts that the admission of the diagnosis evidence in this case was not plain error for several reasons. First, according to the state, the diagnosis testimony was relevant "not simply as evidence that the victim * * * was abused, but for other reasons also." Specifically, the state asserts that the testimony was relevant to explain "the significant time lag between the victim's initial disclosures of abuse and any attempt by police to arrest defendant for that abuse." In the state's view, the testimony helped to show that, in accordance with their usual practice, police had waited for the Liberty House interview to be completed before they contacted defendant regarding the allegations against him and was relevant to counter any inferences the jury might draw regarding that delay. We are not persuaded. Although it is true that the deputy's testimony about the referral to Liberty House and the attendant delay was relevant on that point, the state has not explained why the testimony regarding the diagnosis contained in the report would help explain the time lag between the disclosure and the arrest. To the contrary, as in the cases cited above, the diagnosis evidence had only marginal probative value, and carried with it the implicit message that the victim's report was credible. See Feller , 247 Or. App. at 420, 269 P.3d 110.
Second, the state contends that the admission of the diagnosis evidence is not plain error because Rejaian's "reference to the Liberty House diagnosis did not identify the person making the diagnosis. It thus was not clear that the diagnosis had been made by a credentialed expert, surrounded with the hallmarks of the scientific method." (Internal quotation marks omitted.) In other words, the state asserts that this case differs from Southard and the cases following it because the diagnosis evidence came in through a police officer. We disagree; in our view, that factual difference does not meaningfully distinguish this case from Southard .
In Southard , the diagnosis at issue had come out of an assessment of an allegedly abused child at a child abuse assessment center similar to the one at issue in this case. See Southard , 347 Or. at 130-32, 218 P.3d 104. The court explained that the probative value of the diagnosis evidence was substantially outweighed by the danger of unfair prejudice in part *19 because diagnosis evidence, in the absence of physical evidence, is based on the abuse assessment center crediting the child's report that he or she has been abused and, therefore, does not "tell the jury anything that it was not equally capable of determining." Id. at 140, 218 P.3d 104. However, the "fact that the diagnosis came from a credentialed expert, surrounded by the hallmarks of the scientific method, created a substantial risk" that the jury would be overly impressed by the evidence and "posed the risk that the jury [would] not make its own credibility determination" but would, instead, defer to the implicit determination contained within the diagnosis that the child's report of abuse was credible. Id. at 140-41, 218 P.3d 104.
Here, Perez, the forensic interviewer from Liberty House, testified that a forensic interviewer has "gone through specialized training in order to be able to talk to a child to obtain reliable information, and to do so in a way that meets that child's specific developmental needs, as well as to minimize any kind of interviewer interference." She detailed her own education, training, and experience, and discussed the guidelines regarding which forensic interviewers in Oregon are trained. Perez also explained that, at Liberty House, in addition to a forensic interview, a physical examination which was a "head-to-toe checkup, including private parts" was conducted by a medical provider. She also explained that there was no physical evidence of sexual abuse and that, in the circumstances presented, no such evidence would be expected. Rejaian then testified that the report she received from Liberty House said "there was a diagnosis of highly concerning for child sexual abuse."
In our view, that testimony falls directly within the prohibition of Southard and the cases that follow it. As in Southard , in the *286 absence of physical evidence, the diagnosis was necessarily based on the professionals at Liberty House having credited the child's account of having been inappropriately touched. And, although the diagnosis testimony itself came from a law enforcement officer, it is clear from the context that, like in Southard , it had the aura of expert testimony surrounding it. There was no question that the "diagnosis" came from Liberty House's report, and that report arose from an examination by both a medical provider along with a forensic examination by an expert interviewer *20 whose methods had been detailed to the jury. Thus, in our view, the evidence in question is indistinguishable from the diagnosis evidence in those cases in which we have repeatedly concluded that admission of diagnoses of child sexual abuse in the absence of physical evidence is plain error.[3]
Finally, the state contends that the admission of the diagnosis evidence in this case was not plain error because the record is susceptible to competing inferences about why defendant failed to object to the evidence, and one plausible inference is that defendant made a strategic decision not to do so. The state proposes that because the diagnosis did "not definitively state that the victim had been subjected to sexual abuse," but, instead, was only "highly concerning" for sexual abuse, counsel could have "concluded that the diagnosis would help defendant persuade jurors that reasonable doubt about defendant's guilt existed." The state also suggests that the fact that Southard was decided long before the trial in this case supports its assertion that counsel may have had strategic reasons for not objecting to the admission of the diagnosis evidence. That contention is unavailing. As we have explained, "competing inferences, for purposes of plain error analysis, must be plausible." Lovern , 234 Or. App. at 512, 228 P.3d 688 (internal quotation marks omitted). And, in light of the record in this case, we are unpersuaded that the inference that the state proposes-that defendant did not object to the evidence because he viewed it as helpful to his case-is plausible. The case came down to whether the jury believed A's report of abuse or whether it believed defendant's assertion that he never touched A inappropriately. Defendant never suggested to the jury that the diagnosis evidence supported his theory of the case, which was that A's mother pushed her to fabricate the allegations against defendant as revenge for their breakup. And we do not see how that evidence would help defendant's efforts to convince the jury to doubt A. Instead, as discussed in Merrimon , the diagnosis carried with it the implicit conclusion that the professionals at Liberty House found A's reports credible. See Merrimon , 234 Or. App. at 521, 228 P.3d 666 ; see also *21 Lopez-Cruz , 256 Or. App. at 37-38, 299 P.3d 569 ("[T]he record does not reflect any plausible tactical reason why counsel would have chosen not to object to [the] diagnosis testimony under Southard , and we can conceive of no strategic purpose in not objecting to that testimony."). Accordingly, as we have in "dozens of [other] cases involving unpreserved claims of error under Southard ," we conclude that the admission of the diagnosis evidence in this case was plain error. Volynets-Vasylchenko , 246 Or. App. at 638, 267 P.3d 206.
We turn, finally, to the question whether we should exercise our discretion to consider and correct the plain error in this case. See Ailes , 312 Or. at 382, 823 P.2d 956 (even if an error meets the requisites for plain error, appellate court "must exercise its discretion to consider or not to consider the error, and if the court chooses to consider the error, the court must articulate its reasons for doing so"). Among other things, when determining whether to exercise our discretion, we may consider "the competing interests of the parties; the nature of the case; the gravity of the error; [and] the ends of justice in the particular case." Id. at 382 n. 6, 823 P.2d 956. Here, the state has not argued that any error in admitting the diagnosis evidence was harmless, and we conclude that it was not, given the evidentiary record described above. For the reasons set forth in Lovern and Merrimon , and, in particular, in light of the gravity of the error and *287 the ends of justice in this case, we conclude that is appropriate to exercise our discretion to consider and correct the error. See Merrimon , 234 Or. App. at 520-22, 228 P.3d 666 ; Lovern , 234 Or. App. at 512-14, 228 P.3d 688.
Reversed and remanded on Counts 1, 2, and 3; otherwise affirmed.

Defendant also had been charged with one count of first-degree sodomy and one count of fourth-degree assault. The judgment reflects that those counts were dismissed.

Pursuant to ORAP 5.45(1), "[n]o matter claimed as error will be considered on appeal unless the claim of error was preserved in the lower court * * * provided that the appellate court may, in its discretion, consider a plain error."

We are likewise unpersuaded by the state's attempts to distinguish the "highly concerning" diagnosis from similar diagnoses addressed in other cases. See Feller , 247 Or. App. at 418, 269 P.3d 110 ; Merrimon , 234 Or. App. at 517, 228 P.3d 666.